# WHEELING.

CHES. & OHIO R. R. CO. VS. PACK ET ALS.

<div style="float:right">1873.<br>June Term.</div>

THE CHESAPEAKE AND OHIO RAILROAD COMPANY, PLAINTIFF AND APPELLEE, *against* AUGUSTUS PACK AND OTHERS, DEFENDANTS AND APPELLANTS

```
  6   397
 41   749

  6   397
e62   338
```

## Decided July 15th, 1873.

### SYLLABUS.

The first, and most of the provisions of sec. 5 of Chap. 52 of the Code relate to the mere entry by a company, incorporated for the construction of a work of internal improvement, upon the lands of another person, to examine, survey and lay out parts needed for the improvement. But the sentence next to the last, as amended in the act of 1870, which provides that no company shall, under the chapter, invade the dwelling-house of any person, or any space within twenty feet thereof, without the consent of the owner, not only forbids such entry for experimental and preparatory purposes,

but inhibits the acquisition of the land by judicial proceeding, upon payment of just compensation, without the consent of the owner.

The proviso which immediately follows the sentence first mentioned, that "this act" shall not apply to any city or incorporated town, is construed as if, instead of the words "this act," the words "proceding sentence" were used. It excepts dwelling-houses and the space adjoining them, in cities and incorporated towns, from the protection of the preceding provision, and leaves them, under the general law, subject to be taken upon payment of compensation, without the consent of the owner.

The provision of sec. 5, that a company shall not invade the dwelling-house of any person, or space within twenty feet of it, applies to such house and space occupied either by the owner, in fee, or a tenant.

The circuit courts have the highest general original jurisdiction exercised in the State. Having cognizance of a subject, they are in each case judges of facts that authorize or require their adjudication and action, subject to the right of appeal to the Supreme Court of Appeals. When judgments and decrees have been pronounced or suffered by fraud, accident or mistake, upon a proper proceeding, they may be annulled. But in cases between parties who were properly before the court, or had legal notice and might have appeared and asserted and defended their rights, the facts necessary to warrant a judgment are presumed to have been proved or admitted, and generally the judgment cannot be annulled or disregarded otherwise than as suggested. A proceeding not instituted or prosecuted according to the common law, but authorized and regulated by statute, should not be subject to a different presumption.

Under the provisions of Chap. 42, of the Code, when a company incorparated for the construction of an internal improvement, makes application to a circuit court to appoint commissioners to ascertain a just compensation to the owner of land proposed to be taken, the applicant must prove, or the owner must admit, or it must in some way appear to the court, that the applicant has a lawful right to take the land for the purpose stated in the application, and the court must decide that fact, before the appointment of freeholders. The right to take the land implies the consent of the owner, unless the land be in a city or incorporated town, when consent is not necessary. Consequently the consent, when requisite, must be proved or admitted or given in court, before or at the time when the court adjudicates the right to take the land and proceeds to appoint commissioners.

After the court has acted, when it appears by the record that a proper application in writing was made to the court, and notice given to the owner of the land, or he appeared, and it is recited that the court was of opinion that the applicant had lawful right to take

the land, and the court appointed freeholders, and, with the action of the parties themselves, organized the commissioners, this implies either the consent of the owner, or the location of the land in a city or incorporated town, one or the other of which facts is indispensible, though either is sufficient, to authorize the judgment as to that primary fact. Though after the commissioners have been appointed, if it should appear on the record, or be within the recollection of the court, that there was no proof or admissions of either of these facts, or any others necessary to the judgment given and consequent action taken, or if the owner should show to the court that notwithstanding his employment of reasonable diligence he was, by fraud, accident or mistake, prevented from defending or excepting to the proceeding, and that the actual facts were not adduced, or that those presented to the court might have been overthrown or avoided, or did not warrant the judgment, the court before which the case was pending should set aside the judgment and action; and if, under any such cirtumstances, it failed to do so, and the facts should by bill of exceptions or otherwise, appea in the record, the Court of Appeals would reverse the judgment. But when no such thing so appears, the Court of Appeals must presume that the judgment of the Circuit Court was proper, and accordingly affirm it.

The commissioners are charged with no inquiry as to the consent of the owner, and nothing as to that fact can properly be presented to or considered by them.

Except under special circumstance, when the report has been returned, if no good cause, relative to the action of the commissioners, be shown against it, and it be not erroneous or defective on its face, the court should confirm it.

As the commissioners are composed of disinterested freeholders, carefully selected, with an opportunity to each of the parties to reject such as may be objectionable; and such commissioners not only hear the evidence, but view the land, while the court does neither; it would require very strong evidence of inadequacy or excess in the appraised value of the land and damages, to inflence the court, for that cause alone, to set aside the report.

Under the law, the court enters no other judgment than first to determine the legal right to take the land, and, after the commissioners have acted, to confirm their report. From these judgments, without other sentence of condemnation, emenates the right of the applicant, within twelve month from the date of the report, to pay the sum ascertained, and thereupon to become invested with the title to the land.

The act for the incorporation of the town of Elizaville, and most of the acts for the incorporation of towns in this state, declare what shall be the corporate limits and boundaries of the town, and prov ide that the qualified votes resident therein, shall, at times specified

elect a mayor, recorder and councilmen, who when they have been elected and qualified, shall be a body politic and corporate; that they shall from a common council; and that all the powers of the corporation shall be exercised by them, or under their authority, except when otherwise provided. When the officers have been elected and qualified, the voters resident in the town become a body politic; but the town is not, in fact, incorporated before.

Though the time fixed by the law, when the corporation might have been organized, has passed, yet, without evidence, it cannot be presumed that the voters elected the officers and that they were qualified. There should be some proof of organization or action, to sustain a right that rests on the existence of the corporation.

The case is stated in the opinion of the Court.

*Mollohan* and *Nash,* and *Fitzhugh* for Appellants.

*Laidley* and *Hogeman,* and *Miller* and *Quarrier* for Appellee.

HOFFMAN, Judge.

According to their headings, Chap. 42 of the Code relates to "the taking of land, without the owner's consent, for purposes of public utility," and Chap. 52, to "corporations generally." The main purpose of each, however, is to authorize companies incorporated for the construction and operation of internal improvements, to obtain property for their purposes, and regulate the acquisition.

By an act passed since the act establishing the Code, sec. 5 of Chap. 52 has been amended and re-enacted. This section, as re-enacted, and the two other most important sections of that chapter, now to be considered, are as follows:

"5. Any company incorporated for a work of internal improvement may, by its officers, agents, or servants, enter upon any lands for the purpose of examining the same, and surveying and laying out such as may seem fit to any officer or agent authorized by it; provided, no injury be done to the owner or possessor of the land. But no company shall, under the authority of this section,

throw open fences or enclosures on any land, or construct its works through the same, or in any way injure the property of the owner or possessor, without his consent. Nor shall a company, under the provisions of this chapter, invade the dwelling-house of any person, or any space within twenty feet thereof, without the consent of the owner. And provided further, that this act shall not apply to any city or incorporated town.' "

" 7. If the president and directors of a company incorporated for a work of internal improvement cannot agree on the terms of purchase with those entitled to lands wanted for the purposes of the company, five disinterested freeholders shall be appointed by the circuit court of the county in which such land, or the greater part thereof, shall lie (three of whom may act), for the purpose of ascertaining a just compensation for such land."

" 8. When it is intended to apply for such appointment, notice shall be given and commissioners appointed, and the proceedings thereon shall be the like in all respects as are prescribed by chapter forty-two of this act."

The first, and most of the provisions of sec. 5 of Chap. 52 relate to the mere entry by a company incorporated for the construction of an internal improvement, upon the lands of another person, to examine, survey and lay out parts needed for the contemplated improvement. According to the ordinary signification of language, and especially in connection with the subject of preliminary reconnoisance and delineation, the prohibition to "invade the dwelling-house, or the space within twenty feet of it without the consent of the owner," would not be construed to prohibit a legal proceeding to condemn the land, and so to obtain the title, for public use, upon the payment of just compensation. But after the first sentence, which authorizes the experimental and preparatory observation and action, follows the provision that

49

prohibits a company, under the authority of "this section," to throw open enclosures or construct works through land, or in any way to injure property, without the consent of the owner. And then follows the provision in question, that no person, under the provisions of "this chapter," shall invade a dwelling-house, or space within twenty feet thereof, without the consent of the owner. The disuse of the words "this section" and employment of the words "this chapter," in the latter provision, manifestly indicate that the inhibition to invade a dwelling house, or space adjoining, implies more than the mere denial of the privilege to enter and survey, in order to the regular acquisition and permanent enjoyment of the land. And, certainly, there is no good reason to withhold the liberty to examine and demarkate, and at the same time to confer the privilege to procure condemnation, and finally appropriate and hold the land in fee.

Chap. 52, however, does not itself contain provisions for acquiring land. Secs. 7 and 8 merely provide that when a company, incorporated for internal improvement, cannot agree with the owner of land wanted for its purposes, five disinterested freeholders shall be appointed to ascertain a just compensation for the land; and that when it is intended to apply for such appointment, notice shall be given and the proceedings shall be the like as are prescribed in Chap. 42. Chap. 52 furnishes no further provision on this subject. Chap. 42 details the proceedings to acquire the land. In the Code of Virginia, most of the provisions of the two chapters were embodied in one. When, in the Code of West Virginia, the chapter was divided into two, and when sec. 5 of Chap. 52 was amended and re-enacted, the words "this chapter," in that section, were not changed so as to conform to the division of the chapter.

The proviso at the end of sec. 5, that "this act," shall not extend to any city or incorporated town, is difficult

to interpret, and requires a modification of the language to make it reasonable in effect.

The Constitution of Virginia of 1851, provided that a section of a law should not be amended by reference to its title, but should be re-enacted and published at length. The New Constitution of this State contains a similar provision. Since the adoption of the Constitution of Virginia, just mentioned, generally, sections, when amended, have been re-enacted, with the intention that, as modified, they should be construed with reference to the residue of the chapter of which they were parts, as if the sections, as amended, were embodied in the chapter in the place of the original sections. Not unfrequently the sections are enclosed in marks of quotation, the more strongly to indicate such intent. Sec. 5 of Chap. 52 is thus re-enacted, and would be so considered, but that such construction would make the provision absurd. The Code is itself but one "act" of the Legislature. No part of it, less than the whole, is properly designated as an "act." So that if the proviso that "this act" shall not apply to any city or incorporated town, was construed as if it was embodied in the Code, the effect would be that no part of the Code would apply to the inhabitants of any city or incorporated town. It cannot be supposed to have been the intention of the Legislature, in this way, to exclude the body of the statute law of the State from operation in municipalities. To avoid such a conclusion, the legislative intent ordinarily indicated by this form of enactment, must be discarded.

The proviso might, without very serious change of grammatical arrangement, be regarded, not as a part of the section re-enacted, but as an independent section following it, refering to the act by which the section was re-enacted. But such construction would still deny to a company incorporated for a work of internal improvement, the privilege of entering, surveying and laying out any land or lot, or part of a lot, in an incorporated

town, which such company might want for its purposes; while at the same time the law embodied in secs. 8 and 9 of Chap. 52, and in Chap. 42, authorizes such company, without the consent of the owner, to obtain the title and absolutely appropriate the land. For such inconsistent legislation, there is no sufficient or plausible reason.

The object of the proviso at the end of sec. 5 is not, as suggested in argument, to allow cities and towns to construct internal improvements. The section relates to companies incorporated for the construction of such works, conferring on them certain privileges, and denying to them others. Cities and towns are not companies incorporated for that purpose. Express exclusion of these from provisions applicable only to such companies, would be idle. A city or town may, by legislative authority, construct an internal improvement. But then it is not called a company. Besides, public policy on this subject points to an entirely different interpretation.

In the Code, as it was enacted in 1868, and took effect in 1869, the last sentence of the section was this: "Nor shall a company, under any provision of this Chapter, invade the dwelling-house of any person, or any space within sixty feet thereof, without the consent of the owner." In the act of 1870, to amend the section, the only modification made, was to change "sixty feet" to "twenty feet," and annex the sentence in question, thus: "And provided further that this act shall not apply to any city or incorporated town." In this, the purpose of the Legislature was, unquestionably, to reduce the space about a dwelling-house in the country, protected by the provision, and to withdraw the protection entirely from dwelling-houses and lots in cities and incorporated towns. By changing the words "this act" to the words "the preceding sentence"—but by no less modification of the phraseology—can this or any other supposable legislative intent be expressed.

In the country, ordinarily, there is space enough for the construction of works of internal improvement,

1873.
JuneTerm.

Ches. & Ohio
R. R. Co.
v.
Pack et als.

without invading or acquiring the homesteads of the inhabitants. But, in cities and towns, often, the land necessary for such improvements, could not be obtained without the appropriation of dwellings or their immediate environs. It is therefore indispensible to the general welfare, that these should be made subject to the public need. While, then, it may be impossible to attribute to this legislation a meaning that will harmonize with philology, and at the same time comport with common reason and public interest, it is beyond doubt that the intent and effect of this provision is to leave companies incorporated for the construction of internal improvements at liberty, under other sections of Chap's. 52 and 42 of the Code, upon payment of just compensation, to acquire lands or lots wanted for their purposes, within the precincts of cities or incorporated towns, without the consent of owners.

The language of the provision that a company shall not invade the dwelling-house of any person, or space within twenty feet of it, without the consent of the owner, is general in its application to dwelling-houses and adjoining lands not located in cities or incorporated towns. There is no sufficient reason by construction, to restrict it so that it will apply only to dwelling-houses and lands occupied by the owner himself, in fee, but not to such as are occupied by a tenant for any less estate. The provision must therefore be deemed sufficient to protect, not only the former, but as well the latter class of property.

The provisions of Chap. 42 requiring most careful consideration in the pending inquiry, are as follows:

"2. In any case in which real estate may lawfully be taken for a purpose of public utility, application may be made to the circuit court of the county in which the estate is situated, to appoint commissioners to ascertain a just compensation to the owners of the estate proposed to be taken."

"5. The application must be in writing, describing with reasonable certainty the real estate proposed to be taken, and stating, (so far as they are known to the applicant,) the names of the owners of each parcel, and the nature, of their respective interests. * * * It must also state the purpose to which the said estate is intended to be appropriated ; * * *."

"6. Of such application, ten days notice shall be served on the said owners  *  *  *  and the notice may be given either before the application is presented or afterwards."  *  *  *

"10. * * * Upon its appearing that proper notice has been given, and that the case is one in which the applicant has lawful right to take private property for the purposes stated in the application, upon just compensation, five disinterested freeholders shall be appointed commissioners, to ascertain what will be a just compensation to the person entitled thereto, for each parcel of real estate proposed to be taken." * * *

"11. The appraisement shall be made as follows: thirteen disinterested freeholders shall be nominated by the court, of whom the applicant may strike off four or any less number from the list, and the defendants, or such of them as appear or are represented, may also strike off four or any less number, and after eight names are stricken from the list, the remaining five shall be the commissioners." * * *

"12. Before entering upon the discharge of his duties, each commissioner shall take an oath, * * * that he will honestly and impartialy perform his duties as such commissioner to the best of his skill and judgment." * * *

"13. * * * Any person; interested may attend, * * * produce and examine witnesses, read depositions duly taken and other proper evidence, and be heard, if he require it, in support of his rights, according to the usages and rules of law."

"14. As to each tract, the commissioners, after view-

ing the same, and hearing any proper evidence which is offered, shall ascertain what will be a just compensation, to the person entitled thereto, for so much thereof as is proposed to be taken, and for damage to the residue of the tract, beyond the peculiar benefits to be derived in respect to such residue from the work to be constructed, * * * and make report;" the form of which is, by the section, prescribed.

" 17. When such report has been returned, unless good cause be shown against it, or it be defective or erroneous on its face, the court shall confirm the same, and order it to be recorded on the chancery order-book of the court." * * *

" 18. At any time within twelve months after the report has been confirmed and ordered to be recorded, the sum so ascertained, with legal interest thereon from the date of the report until payment, may be paid by the applicant to the person entitled thereto, or into court. Upon such payment, the title to that part of the land so paid for shall be absolutely vested in fee simple." * *

" 19. If good cause be shown against the report, or if it be defective or erroneous on its face, the court, as may seem to be proper, may set it aside, or re-commit it to the commissioners for further report." * * *

Under the late Constitution and legislation of this State, the circuit courts had not only the highest and most general, but the only general original jurisdiction exercised by any court in the State. Under the present Constitution the circuit courts have the highest general original jurisdiction. Having cognizance of a subject, they were, and are, in each case judges of the facts that authorize or require their adjudication and action, subject when it is proper, to the effect of trial by jury or enquiry by commissioners, and, in cases where it is allowed, to the right of appeal to the Supreme Court of Appeals, by which, if it properly appears that a circuit court erred, its judgment or decree will be reversed. The circuit courts may, however, according to and

within appropriate regulations and limitations, correct their own interlocutory orders, judgments and decrees, before they have finally disposed of the subject. And under statutory authority, in special cases, they may do so afterwards. And when judgments, or decrees, have been procured or suffered by fraud, accident or surprise, upon a proper proceeding, they may be annulled. But in cases between parties who were properly before the court, or had legal notice and might have appeared and asserted and defended their rights, the facts necessary to warrant a judgment—especially when regularly alleged or recited, either particularly or generally—are presumed to have been proved or admitted; and the judgment cannot be set aside, annulled or disregarded, otherwise than as has been suggested. A proceeding not instituted or prosecuted according to the common law, but authorized and regulated by statute, as well as I can understand the subject, should not occasion a different presumption or action.

Under the provisions of Chap. 42, when a company, incorporated for the construction of an internal improvement, makes application to a circuit court to appoint commissioners to ascertain a just compensation to the owner of land proposed to be taken, the applicant must prove or the owner admit, or it must in some way appear to the court, that the applicant has a lawful right to take the land for the purpose stated in the application, and the court must decide that fact, before the appointmant of freeholders. The right to take the land implies the consent of the owner; unless the land be in a city or incorporated town, when consent is not necessary. Consequently the consent, when requisite, must be proved or admitted or given in court, before or at the time when the court adjudicates the right to take the land and proceeds to appoint commissioners.

After the court has acted, when it appears by the record that a proper application in writing was made to the court, and notice given to the owner of the land, or he

appeared, and it is found recited that the court was of opinion that the applicant had lawful right to take the land, and the court appointed freeholders, and, with the action of the parties themselves, organized the commissioners, this implies either the consent of the owner, or the location of the land in a city or incorporated town— one or the other of which facts is indispensable, though either is sufficient, to authorize the judgment as to that primary fact. Though after the commissioners have been appointed, if it should appear on the record, or be within the recollection of the court, that there was no proof or admissions of either of these facts, or any others necessary to the judgment given and consequent action taken; or if the owner should show to the court that notwithstanding his employment of reasonable diligence, he was, by fraud, accident or mistake, prevented from defending or excepting to the proceeding, and that the actual facts were not adduced, or that those presented to the court might have been overthrown or avoided, or did not warrant the judgment; the court before which the case was pending should set aside the judgment and action; and if, under any such circumstances, the court failed to do so, and the facts should by bill of exceptions, or otherwise, appear in the record, this Court would reverse the judgment. But, when no such thing so appears, this Court must presume that the judgment of the circuit court was proper, and accordingly must affirm it.

Many authorities, upon subjects more or less analagous, strongly indicate that even though the owner may not have expressly consented that an improvement company applying for it, should take his dwelling house and adjoining land, yet the company's filing the application, their notice to, or the appearance of the owner, and his failure to object—especially when he participates in the designation of commissioners to appraise the land—in themselves constitute, or conclusively imply consent.

If the court, with the co-operation of the parties,

50

should appoint commissioners, whose duty it would be to bring witnesses before them, hear them testify, read depositions, and go upon and view the land, hear counsel, and ascertain a just compensation to the owner for the land to be taken, and damage to other land, beyond the peculiar benefits to be derived from the contemplated improvement, and make their report; all before the court should finally determine the right to take the land for any compensation whatever; this would occasion a most unreasonable and onerous expenditure of labor and money, without assurance of benefit to either party. With such a practice, the owner would take his chance for high damages, and afterwards, if he were disappointed, would deny his consent, or controvert the right to take the land, and so thwart the purpose of the proceeding. Failing to object, and consequently supposed to consent, he would thus abuse the credulity of the applicant, evade the vigilance of the court, and having availed himself of the attendance and examination of witnesses, and the action of commissioners, would afterwards, as the result might be favorable or unsatisfactory, adopt or reject the appraisement.

The commissioners are charged with no inquiry as to the consent of the owner, and nothing as to that fact can properly be presented to or considered by them. Indeed, so far as the statute expresses its purpose, the court itself, having appointed the commissioners, has afterwards no power in any case to reconsider the propriety of what it did. Though, I suppose, under the peculiar circumstances heretofore suggested, the court may review and reverse its former action and again act on the subject.

Except under such circumstances, when the report has been returned, if no good cause relative to the action of the commissioners be shown against the report, and it be not erroneous or defective on its face, the court should confirm it.

1873.
June Term.

Ches. & Ohio.
R. R. Co.
v.
Pack et als.

As the commissioners are composed of disinterested freeholders carefully selected, with an opportunity to each of the parties to reject such as may be objectionable; and such commissioners not only hear the evidence, but view the land, while the court does neither; it would require very strong evidence of inadequacy or excess in the appraised value of the land and damages, to influence the court, for that cause alone, to set aside the report. Indeed, it is difficult to understand how the court, that cannot have the peculiar advantages that the commissioners enjoy, can, without proof of impropriety or irregularity, at all intelligently review their action, and decide that the appraisement is unjust.

Under the law, the court enters no other judgment than, first to determine the legal right to take the land, and, after the commissioners have acted, to confirm their report. From these judgments, without other sentence of condemnation, emenates the right of the applicant, within twelve months from the date of the report, to pay the sum ascertained, with interest, and thereupon to become invested with the title to the land.

The interest of the land owner involved in cases of this class, is much less important than in others subject to the action of courts. Indeed, beyond the mere preference for lands and houses, rather than their value in money, no interest is at hazzard; for the owner whose land is taken, receives adequate compensation; while, in most legal controversies, the money or property recovered by the one party is absolutely lost to the other, without remuneration.

The act of the Legislature to incorporate the town of Elizaville, passed in the year 1868, contains these provisions:

"1. The corporate limits and boundaries of the town of Elizaville, * * *, shall be," as described.

"2. The municipal authorities of said town shall be a mayor, a recorder and five councilmen, who together shall form a common council.

1873.
June Term.

Ches. & Ohio
R. R. Co.
v.
Pack et als.

"3. The mayor, recorder and councilmen, so soon as they have been elected and qualified as hereinafter provided, shall be a body politic and corporate, by the name of "The town of Elizaville." * * *

"4. All the corporate powers of said corporation shall be exercised by the said council, or under their authority, except where otherwise provided."

"7. The mayor, recorder and councilmen shall be elected by the citizens of said town who may be entitled to vote under this act." * * *

"8. The first election under this act shall be held on the fourth Thursday of March, eighteen hundred and sixty-eight, at the usual place of voting in said town, under the supervision of a justice of Loudan township; and annually thereafter." * * *

The council are required to perform varied and numerous duties and functions, tending to the administration of municipal governments.

The last section is this:

" 28. The said town, and taxable persons and property therein, shall be exempt from all expenses or liabilities for the construction or repair of roads or bridges outside of the corporate limits of said town."

Generally, legislative acts for the creation of municipal corporations confer the franchise on the people or voters of the city or town. The law itself creates them a body politic, without their acceptance, organization or other action.

In this State, some acts expressly make the inhabitants of a place, and others make the place itself, by the use of the word, a body politic or town corporate. But most of the statutes I have found, are prototypes of the act for the incorporation of Elizaville, as far as its provisions have been quoted here.

This act declared what the corporate limits of the town should be. It did not expressly make the residents, or citizens, or any class of them, as such, a corporation; but provided that the voters resident in the

1873.
June Term.

Ches. & Ohio
R. R. Co.
v.
Pack et als.

town should elect a mayor, recorder and councilmen, who, when elected and qualified, should be a corporation, and constitute a council; and that these should appoint other officers, and with them, regulate and administer the government of the body politic. Certainly, the right of the voters of the town to elect officers who shall make and execute municipal laws to bind and control themselves, as well as the other inhabitants of the town, is a primary, fundamental and most important liberty of the corporation. Yet, according to the law by which it is conferred, it may be exercised to organize the corporation, either completely or partially, as well as, after its organization, to carry it out.

The town of Elizaville—as most towns in the State newly incorporated, or intended to be incorporated— contained but a small population, with limited wants and resources. After the passage of the act for its incorporation, the voters might or might not, at the first, or any subsequent time named for the purpose, elect officers, and inaugurate the corporation as an actual entity. The law declared that the people within the limits of its operation, should have privileges and immunities that were not in their character proper to be conferred upon a mere potential corporation, but were appropriate only to an existing acting body politic, in condition to perform the functions indicated by the law of its creation. The act of incorporation containing the provision that when the officers have been elected and qualified, without any express declaration, that the people or voters shall be a body politic, I can see no sufficient reason why the town should be deemed incorporated, before the performance of the condition pre-requisite to its vital existence and practical action. But I think, when the voters have once elected the officers that constitute the council, and these have qualified and commenced the performance of their duties, the voters themselves constitute a body politic, of which the council is the representative.

Though the time fixed by the law, when the corpora-

tion might have been organized, has passed, yet, without evidence, it cannot be presumed that the voters elected the officers, and they were qualified. There should be some proof of organization or action, to sustain a right that rests on the existence of the corporation. What the character of the evidence should be to prove the fact, need not be now considered.

In this case, on the 22nd day of March 1871, the Chesapeake and Ohio Railroad Company made application in writing to the Circuit Court of Kanawha county, to appoint commissioners to ascertain a just compensation to the owner, for a tract of land in the town of Elizaville, in the county of Kanawha, owned by Augustus Pack, wanted for the purpose of the company. It appeared, by a paper annexed to the application, that there was a log dwelling-house on the land. On the same day, the parties by their attorneys came, and the Court being of opinion that the applicant had lawful right to take the land for the purpose stated, nominated thirteen disinterested freeholders of the county of Kanawha, as commissioners to ascertain a just compensation to be paid to Pack for the land: Whereupon the applicant struck four names from the list, and Pack (and other claimants of the land,) struck four others therefrom, leaving five: And it was ordered that they be appointed commissioners to ascertain a just compensation for taking the land.

On the 13th April, four of the commissioners acting, they made their report, in the form prescribed by the law, whereby it appeared that they viewed the land described in the application, claimed by Pack, (and also claimed by another,) and were of opinion that five hundred dollars would be a just compensation for so much thereof as was then proposed to be taken, described in the report, containing one fourth of an acre, as well as for damages to the residue, beyond the peculiar benefits which would be derived to the residue from the construction of the railroad.

1873.
June Term.

Ches. & Ohio
R. R. Co.
v.
Pack et als.

On the 15th April, the report, signed by the four commissioners, was returned to the clerk's officers and filed with the papers.

On the 17th April, the company paid into court the sum of five hundred dollars, ascertained by the commissioners.

On the 18th April, Pack, having previously moved the court to set aside the order made on the 23rd March, appointing commissioners, and to dismiss the proceedings upon the ground that the condemnation embraced a dwelling-house, kitchen and coalhouse belonging to him, filed an answer, and the company having appeared, the cause was heard upon the proofs, and argued: Upon consideration whereof the Court overruled the motion. Pack excepted, and a bill was signed and saved.

By the bill of exceptions, it appeared that on the 12th April, Pack filed with the commissioners an exception and objection to the condemnation of the land, because it embraced a dwelling-house, kitchen and coal-house, and the company had no right or authority to condemn the land: That at the hearing of the motion he proved that there was a dwelling-house on the land which was occupied by Adkins as his tenant; and read a deed from Hurt to himself, for the land: And that the company read the report of the commissioners, and evidence taken before them: Among this evidence, was a deposition of Pack, in which he stated that he had never given any consent to the company to take the land; and affidavits of witnesses, stating that the land was within the corporate limits of the town of Elizaville; but that no election for mayor, recorder and councilmen of the town was held, and no organization took place, under the act of incorporation.

But the bill of exceptions does not show what was or was not proved, or done, on the 22nd March, when the Court considered and decided the right to take the property, and, with the co-operation of the parties, appointed the commissioners. Nor does it show any reason

why Pack did not object or except to that action of the Court. Whether there was or was not sufficient evidence that Pack had before consented, or he then expressly consented, does not appear. The entire subject is left by the bill of exceptions to the presumption that the facts before the Court, at the time, warranted the judgment that the applicant had lawful right to take the land for its purposes, fortified by Pack's appearance in the case, his failure to object and except, and his participation in the appointment of the commissioners.

On the 28th March 1872, the proceeding was heard on the report of the commissioners, and on the exceptions thereto, before made, that the land was not subject to condemnation, and another exception filed after the case had proceeded to argument, that the compensation was insufficient: Upon consideration of which, the Court overruled the exceptions: And the report not appearing to be defective or erroneous on its face, and no good cause having been shown against it, the Court confirmed the report.

No exception was taken to this judgment. In the former bill of exceptions, are depositions of Pack and Adkins, his tenant, as to the value of the land, and depositions of two other witnesses on the same subject, having an opposite tendency. But to detail or analyze this evidence would be worse than idle. If competent, it does not approximate the force necessary to overthrow the report of the commissioners.

The judgment will be affirmed with damages and costs.

HAYMOND, President, PAULL and MOORE, Judges, concur in the foregoing opinion.