NEWBERRY *v.* STARR.

1. STATUTES—REPEAL—SCHOOLS AND SCHOOL DISTRICTS.
   Where the school district of the city of Royal Oak was created as a district of the third class, and its powers defined, under Act No. 169, Pub. Acts 1927, failure of the city clerk to call a special election to provide a school board, a ministerial act, did not nullify the statute or destroy the corporation created, and that said act was repealed by Act No. 319, Pub. Acts 1927, before the board was elected, did not affect the existence of the district or the validity of the election of the board; said act providing that all such districts should continue to exist.

2. SAME—IMMEDIATE EFFECT—CONSTITUTIONAL LAW.
   Giving immediate effect to Act No. 169, Pub. Acts 1927, providing that school districts in cities having portions of five or more districts should constitute a single school district, did not violate the Constitution (article 5, § 21), since the act relates to important State agencies having to do with preservation of public health, peace, and safety.

3. CONSTITUTIONAL LAW—DOUBTS RESOLVED IN FAVOR OF LEGISLATION.
   Doubts must be resolved in favor of legislation, and every intendment must be taken in its favor.

NORTH, C. J., and SHARPE and FELLOWS, JJ., dissenting.

Error to Oakland; Gillespie (Glenn C.), J. Submitted January 22, 1929. (Docket No. 77, Calendar No. 34,075.) Decided June 20, 1929.

*Quo warranto* proceedings by Burton Newberry, Royal Oak township, and School District No. 5 of

Royal Oak township against Clara Ellen Starr, School District of the City of Royal Oak, and others to test the existence of the defendant district and the right to office of the board members thereof. From judgment for defendants, plaintiffs bring error. Affirmed.

*Pelton & McGee* and *Arthur E. Moore,* for plaintiffs.

*W. C. Hudson,* for defendants.

CLARK, J. Act No. 169, Pub. Acts 1927, was approved on May 14th and given immediate effect. We quote a part of section 1:

"Any incorporated city having within its boundaries portions of five or more school districts shall be a single school district which boundaries shall be coterminous with the boundaries of said city. Said school district shall be known as the 'School District of the City of .......... ' Said school district shall be organized and governed as provided for third class district under the provisions of act number one hundred sixty-six of the public acts of nineteen hundred seventeen and any amendments in force at the time this act takes effect and any amendments that may hereafter be enacted, and by the general school laws of the State not inconsistent herewith. Within thirty days after this act shall take effect, the city clerk of said city shall call an election within said city at a time and place to be designated by him for the election of seven members of the board of education whose terms, manner of qualifying, organization of the board, and officers shall be as provided for third class districts in said act number one hundred sixty-six of the public acts of nineteen hundred seventeen, as amended."

Section 2 provides of division of assets and liabilities with other districts, section 3 of distribution of primary school money and of taking census, and section 4 of territory outside the district created. The city of Royal Oak had within its boundaries portions of five or more school districts. The city clerk did not call a special election within the period of 30 days, but he did call one to be held on June 11, 1928, at which a board of education was elected. Information in *quo warranto* was filed by the plaintiffs against defendants, School District of the City of Royal Oak and the members of its board of education, to test the existence of the defendant district and the right to office of the said board members. Defendants had judgment. Plaintiffs bring error.

Act No. 169 was repealed by Act No. 319, Pub. Acts 1927, a codification of school laws, which took effect September 5, 1927, the expiration of 90 days from the end of the legislative session.

If the defendant district was "organized and existing under the laws of this State" on September 4, 1927, it is now a district, for section 1, chapter 6, Act No. 319, provides that all such districts "shall constitute and continue to be a school district under this chapter."

In the quoted language of section 1, Act No. 169, it will be seen that a district created by the act is to be "under the provisions of Act No. 166 of the Public Acts of 1917," etc. (Comp. Laws Supp. 1922, § 5870[24] *et seq.*). That act contained a provision that it was not to take effect in any district until approved by a majority of school electors voting thereon at an election at which the question was submitted. It is clear that the legislature adopted by reference in Act No. 169 the provision of Act No. 166, but without that relating to approval by the

electors, for it is not to be thought that the legislature created a school district and at the same time permitted the electors thereof to say whether or not the district was to have any governing laws, and it was directed to proceed under that act.

Act No. 169 did create a school district. It described the district, gave it a name, and by reference defined its powers. The failure of the clerk to do a ministerial act, to call a special election to provide a board, and that for a time the district had no board, did not nullify the statute, did not destroy the corporation created. A school district may lose its board without thereby losing its corporate existence.

The chief question in the case is the right of the legislature to give Act No. 169 immediate effect. The Constitution, Art. 5, § 21, provides in part—

"No * * * act shall take effect or be in force until the expiration of ninety days from the end of the session at which the same is passed, except that the legislature may give immediate effect to acts making appropriations and acts immediately necessary for the preservation of the public peace, health or safety by a two-thirds vote of the members elected to each house."

The trial judge in an opinion filed, after quoting from *MacQueen* v. *Port Huron City Commission,* 194 Mich. 328,—

"Fundamentally, provision for and control of our public school system is a State matter, delegated to and lodged in the State legislature by the Constitution in a separate article entirely distinct from that relating to local government. The general policy of the State has been to retain control of its school system, to be administered throughout the State under State laws by local State agencies organized

with plenary powers independent of the local gov-
ernment with which, by location and geographical
boundaries, they are necessarily closely associated
and to a greater or less extent authorized to co-oper-
ate. Education belongs to the State. It is no part
of the local self-government inherent in the town-
ship or municipality except so far as the legislature
may choose to make it such,''—

said:

"Keeping in mind the duty of the State to pro-
vide proper educational facilities, and the control
and regulation which the legislature has always ex-
ercised over such State agencies, it is clear that a
statute providing for the consolidation of school
districts stands on a different footing, so far as the
constitutional provision under which acts may be
given immediate effect is concerned, than a statute
which merely affects the rights of a citizen of the
State. At the time of the passage of the act the gen-
eral statutes fixed many definite dates at which the
officers of school districts must perform official acts.
The machinery provided by law for the carrying on
of the functions of school districts depended upon
the performance by such officers of certain duties at
fixed times.

"For illustration, the valuation of any whole
school district for the purpose of taxation was the
assessed value of the property contained therein as
fixed by the board of review at its annual meetings
(2 Comp. Laws 1915, § 5644); the school district
board between the second Monday in July and the
first Monday in August must make out and deliver
to the township clerk a report of all taxes to be
voted (2 Comp. Laws 1915, § 5667); the supervisor
of each township must assess a one-mill tax upon
the township and report the aggregate amount of
such assessments to the clerk, who in turn must re-
port the amount to each school district before Sep-
tember 1st (2 Comp. Laws 1915, § 5700); the annual

school district meetings for the election of school officers and the transaction of other business of the district must be held on the second Monday in July and the school year commences on the same date (2 Comp. Laws 1915, § 5661); the county treasurer must apportion the fines paid, etc., to the various school districts before August 1st (2 Comp. Laws 1915, § 5750); the superintendent of public instruction between the 5th and 15th days of July in each year must apportion 95 per cent. of the primary school interest fund among the several cities and townships in proportion to the number of children, etc. (2 Comp. Laws 1915, § 5644); the township clerk on the first Monday in August must report to the superintendent of public instruction the number of school districts in his township with a statement of the amount of money raised for school libraries (2 Comp. Laws 1915, § 5694), and the county treasurer must furnish to the superintendent of public instruction before July 1st, following the receipt of assessment rolls, a statement of the assessed valuation of each school district, etc., within his county (2 Comp. Laws 1915, § 5644).

"A more searching examination of the statutes relating to the duties of school district officers and the conduct of the affairs of school districts would serve to emphasize the necessity of giving immediate effect to any act relating to the consolidation of school districts, if the operations of the new district were to be carried on without interruption. If the new district created by the act was to function during the ensuing school year it was necessary that the act be given immediate effect, so the taxable property of the new district might be determined and the necessary funds provided to meet the expenses of the district. The officers of the district, under the general school laws, were expressly charged with the responsibility of providing for the safety of the school buildings and the health and physical well-being of the pupils who were in attendance. Cer-

tainly no more important duty rests upon the legislature than to provide adequate and proper educational facilities for the youth of the State, and I do not believe it will be said the orderly and continuous operation of the primary school system is not necessary for the preservation of public peace, health, and safety.''

The board may close the school and may say temporarily who shall be excluded from it during an epidemic of smallpox or other contagious disease (*Mathews* v. *Kalamazoo Bd. of Education,* 127 Mich. 530 [54 L. R. A. 736]), and it is the duty of the board to enforce proper health regulation requiring exclusion from school, during the prevalence of smallpox (*People* v. *Lansing Bd. of Education,* 224 Mich. 388).

A few powers or duties usually conferred on district boards under law of the time were: To provide for water supply for pupils, for teaching how dangerous communicable diseases may be spread, for sanitary conditions and medical inspection, for physical training and education, for expulsion of certain pupils, for military training in certain high schools, and for assistance of enforcement of compulsory education.

In *Attorney General* v. *Lindsay,* 178 Mich. 524, the provision of the Constitution was considered as affecting municipal ownership amendment to the charter of the city of Detroit, and it was said by Mr. Justice BROOKE:

''In reaching a determination, however, I am of opinion that every intendment should be taken in favor of the propriety of legislative action. In cases of doubt, the courts should never interfere to thwart the legislative will, but, where the action

constitutes a clear violation of the limitation imposed, it should unhesitatingly be held to be invalid.

"With this view of the duty of the courts in mind, how should the action of the legislature, with reference to the so-called Verdier act, be regarded? The act is general in its scope and affects or may affect the charters of all cities within the State. Under our scheme of government, municipalities have control of agencies for the supply of water, the preservation of health, and for police protection. I do not think it can be said with certainty that the act in question was not immediately necessary for the preservation of the public · peace, health, and safety, and the courts should interfere only where that conclusion is inevitable."

The inquiry is: Has the statute in question any real or substantial relation to preservation of public health, peace, or safety? *Mugler* v. *Kansas,* 123 U. S. 623 (18 Sup. Ct. 273). Does it have a relation to these ends? *In re Jacobs,* 98 N. Y. 98 (50 Am. Rep. 636). See *People* v. *Urcavitch,* 210 Mich. 431; *People* v. *Stambosva,* 210 Mich. 436.

As above set forth, school districts have most important duties relating to preservation of health, and less important duties respecting peace and safety. They differ from cities (duties suggested by Mr. Justice BROOKE) in this regard only in degree. The reasoning in the *Lindsay Case* is applicable to this.

The legislature may have considered, in the interest of public health at least, it was immediately necessary, to secure co-ordination and co-operation of the agencies of certain cities and school districts described in the act, that each should embrace the same territory. The act relates to important State agencies having to do with preservation of public health, peace, and safety.

Doubts must be resolved in favor of the legislation, and every intendment must be taken in its favor.

So considered, we cannot say that the statute offends the quoted constitutional provision.

Judgment affirmed.

Fead, Wiest, McDonald, and Potter, JJ., concurred with Clark, J.

Fellows, J. (*dissenting*). I am unable to agree that by any possibility the preservation of the public peace, or the public health, or the public safety necessitated the making of a single school district of Royal Oak. At least the citizens of Royal Oak did· not entertain any such view, as they waited over a year after the act was passed and. over nine months after it was repealed, during which time a full school year had passed, before they even deemed it convenient for their community and took steps looking to its acceptance. My brother points out the power of school districts with reference to health and safety, but he does not point out, nor does any one else connected with the case point out, that the five school districts which in whole or in part are located in Royal Oak did not possess all the power on such subjects as would a school district organized under Act No. 169, Pub. Acts 1927. Manifestly, if the new order of things is the same under the new act as was the old order of things under the old act, then the new act furnishes no possible further preservation of the public peace or the public health or the public safety than did the old one, and a legislative declaration to the contrary has no possible force.

When the convention elected to frame a new Constitution met, there were two legislative evils which had grown up over a considerable period of time,

which were really crying evils, and which the convention was called upon to meet. They were: (1) local legislation, and (2) hasty and illy considered legislation, both with little or no notice to the people affected. Under the old Constitution, I have seen the fundamental law of a municipal corporation entirely changed between the rising and the setting of the sun without over a dozen of the citizens of the municipality having any knowledge of the change. The convention met the question of local legislation by the provisions found in section 30, article 5, and the hasty legislation by the provisions of section 22 of the same article, and the provision of section 21 here under consideration. The legislature has quite studiously followed the provision requiring that bills be printed five days before being acted upon, but by adopting systems of classification and seeing danger of widespread epidemics and possible invasions by friendly States, neither of which is a possibility, the provisions sought to curb the two legislative evils are today of little effect. Practically as many really local bills are passed and given immediate effect as were before the present Constitution. Few of them reach the courts. But in my judgment, the courts are not entirely blameless. By energetic search the courts have been able to discover a "reasonable doubt" of the invalidity of the act somewhere, and, therefore, go along with the legislative practice. The convention provided that the legislature might give immediate effect to bills making appropriations, a very necessary provision, and also provided for emergencies that might arise when the public peace or the public health or the public safety were endangered, enabling the legislature by a two-thirds vote to avoid a catastrophe. But I can not conceive that a layman who voted for the instrument

(and most of the people who voted for this Constitution were laymen), when he voted for it with these provisions, expected that there would be a public epidemic or the invasion of a foreign foe, or disastrous riots unless Royal Oak was made a single school district. I am unable to conclude from the record, from anything this court may judicially know, from anything a reasonably fertile imagination may bring to my mind, that it is immediately necessary for the preservation of the public peace or the public health or the public safety, that Royal Oak have a single school district a year before that city discovered its necessity.

The trial judge reached the conclusion that Act No. 169 was repealed by implication by Act No. 319. Neither party seems to seriously controvert this holding. Nor do I think they can. Act No. 319 (the school code) was a consolidation and revision of the school laws of the State and covered the entire field. I agree with the holding of the trial judge, and will not take time or space to discuss a question there is no dispute about.

There is, however, a question which I think merits serious consideration. It is contingent on a majority of the court joining in the opinion of Mr. Justice CLARK, a contingency several years of experience has taught me may happen. What I shall now say will be upon the theory that the act was validly given immediate effect. The school code provides in section 1, chapter 2, part 1, as follows:

"Districts heretofore organized shall remain and have the same boundaries as at the time of the passage of this act, subject to change hereafter in the discretion of the township board."

Section 1 of chapter 6 of the same part uses the words "organized" and "operating" while sec-

tion 1, chapter 1, part 2, after providing that schools
need not reorganize, refers to schools "now organ-
ized as a district."

If the bill was validly given immediate effect, it
was in force as an act of the legislature from the
day it was signed by the governor, May 14, 1927, un-
til the school code took effect September 5th, when
it was repealed. During this time there was noth-
ing done under it. For a solid school year the other
districts, which, if the act was in force, were either
entirely wiped out or materially changed, continued
to levy and collect taxes, hire school teachers, and
function as they had done before. The new district
was but a paper district; it had no officers; pos-
sessed no school property; had no teachers. It was
doubtless "established" as a school district on
paper, but in my judgment, it was not "organized"
as a school district so as to perpetuate it as a dis-
trict within the meaning of the school code. I do not
think it was organized until officers were elected to
discharge the corporate functions, and this did not
take place until over nine months after the act had
been repealed. The cases are not numerous which
deal with this specific question. Numerous cases
will be found where acceptance of the act by the
people affected is required and where the courts
have held that the proceedings must strictly follow
the act. Likewise, cases will be found where consent
is not required, and the courts hold that the legisla-
ture may create the public corporation for public
purposes without consent of the governed. Both
classes of cases are beside the mark. A few cases
are found which deal with the question of when a
municipal or *quasi* municipal corporation is organ-
ized. Defendants' counsel rely on a line of Minne-
sota cases which uses language tending to sustain

their contention, but that court early pointed out the distinction between established counties and organized counties. In *State* v. *Parker,* 25 Minn. 215, it was said:

"This court, in *State* v. *McFadden,* 23 Minn. 40, defines the distinction between organized and established counties, by stating, in effect, that the establishing of a county is the setting apart of certain territory to be in the future organized as a political community, or *quasi* corporation for political purposes; and the organizing of a county is the vesting in the people of such territory such corporate rights and powers."

In *Haynes* v. *County of Washington,* 19 Ill. 66, it was said:

"Grants of corporate powers, for purposes of local municipal government, such as belong to towns and cities, are a delegation of a portion of the general sovereignty of the State, designed to enable the inhabitants of particular localities to establish and maintain police regulations, and to advance their common prosperity. A charter, or act of incorporation, is but evidence of the powers delegated, and which powers remain dormant, or in abeyance, until, in the mode pointed out in the charter, the inhabitants, for whose benefit those powers are granted, bring them into life and exercise, by an organization of the local government."

In *State, ex rel. Jackson Township,* v. *Arnold,* 38 Ind. 41, it was said:

"The town cannot be a corporation, in a proper sense, until its officers and its board of trustees shall have been elected, and a president of the board designated."

And in *Chesapeake & Ohio R. Co.* v. *Pack,* 6 W. Va. 397, it was said:

"After the passage of the act for its incorporation, the voters might or might not, at the first, or any subsequent time named for the purpose, elect officers, and inaugurate the corporation as an actual entity. The law declared that the people within the limits of its operation, should have privileges and immunities that were not in their character proper to be conferred upon a mere potential corporation, but were appropriate only to an existing acting body politic, in condition to perform the functions indicated by the law of its creation. The act of incorporation containing the provision that when the officers have been elected and qualified, without any express declaration, that the people or voters shall be a body politic, I can see no sufficient reason why the town should be deemed incorporated, before the performance of the condition pre-requisite to its vital existence and practical action. But I think, when the voters have once elected the officers that constitute the council, and these have qualified and commenced the performance of their duties, the voters themselves constitute a body politic, of which the council is the representative."

It was not until June 12, 1928, over nine months after the repeal of Act No. 169, that the election was held and the officers of the district elected. This was also over nine months after the school code took effect. I do not think this school district was "organized" when the school code took effect.

In my opinion, the judgment should be reversed and the case remanded, with instructions to enter a judgment of ouster.

NORTH, C. J., and SHARPE, J., concurred with FELLOWS, J.