RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 13a0215p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

CITY OF PONTIAC RETIRED EMPLOYEES
ASSOCIATION; DELMER ANDERSON; THOMAS
HUNTER; HENRY C. SHOEMAKER; YVETTE
TALLEY; DEBRA WOODS; JOHN CLAYA,
         *Plaintiffs - Appellants*,

     *v.*

LOUIS SCHIMMEL, Individually and in his
capacity as Emergency Manager of the City
of Pontiac; CATHY SQUARE, Individually and
in her official capacity as the Director of
Human Resources and Labor Relations for
the City of Pontiac; CITY OF PONTIAC,
         *Defendants - Appellees*.

No. 12-2087

> Appeal from the United States District Court
> for the Eastern District of Michigan at Detroit.
> No. 2:12-cv-12830—Lawrence P. Zatkoff, District Judge.

Argued: January 15, 2013

Decided and Filed:  August 9, 2013

Before:  COLE and GRIFFIN, Circuit Judges; GWIN, District Judge.*

_____

## COUNSEL

**ARGUED:** Alec Scott Gibbs, LAW OFFICE OF GREGORY T. GIBBS, Flint, Michigan, for Appellants.  Stephen J. Hitchcock, GIARMARCO, MULLINS & HORTON, P.C., Troy, Michigan, for Appellees.  **ON BRIEF:** Alec Scott Gibbs, Gregory Thomas Gibbs, LAW OFFICE OF GREGORY T. GIBBS, Flint, Michigan, for Appellants. Stephen J. Hitchcock, GIARMARCO, MULLINS & HORTON, P.C., Troy, Michigan, for Appellees.

     GWIN, D. J., delivered the opinion of the court, in which COLE, J., joined. GRIFFIN, J. (pp. 18-35), delivered a separate dissenting opinion.

_____

    *The Honorable James S. Gwin, United States District Judge for the Northern District of Ohio, sitting by designation.

1

———————————

**OPINION**

———————————

GWIN, District Judge.  Like many Michigan municipalities, the City of Pontiac has experienced significant economic difficulties, especially since the 2008 financial collapse.  To address Pontiac's problems, Michigan's Governor appointed Louis Schimmel as Pontiac's emergency manager.  Acting under Public Act 4, Michigan's then-existing emergency manager law, Schimmel modified the collective bargaining agreements of Pontiac's retired employees.  He also modified severance benefits, including pension benefits, that Pontiac had given to other retirees not covered by collective bargaining agreements.  In this case, those retired employees challenge the emergency manager's power to reduce their retirement benefits.

The retired employees say that Schimmel and Pontiac violated their federal constitutional rights, including rights given under the Contracts Clause, the Due Process Clause, and the Bankruptcy Clause.  The retired employees do not specifically argue that Schimmel violated Michigan's Constitution when he changed their pension rights.  But, the Michigan Legislature may have violated the Michigan Constitution when it passed Public Act 4.  In addition, Michigan voters rejected Public Act 4 by referendum, and this rejection may have rendered Schimmel's actions void.

Despite the parties' inadequate briefing of these state-law issues, we decline to decide the case on federal constitutional grounds.  Because state law could provide an alternative basis for deciding this case, we **VACATE** and **REMAND** to the district court to conduct additional fact-finding and consider these state-law issues.  Specifically, did two-thirds of both houses of the Michigan Legislature vote to make Public Act 4 immediately effective?  And, since Michigan voters rejected Public Act 4 in a referendum, do the acts taken under the rejected law have any power?  Because similar

issues face many Michigan municipalities, we ask the district court to expedite consideration of the remanded case.

## I. Background

### A. Michigan's Emergency Manager Laws

Emergency Manager Louis Schimmel (the "Emergency Manager") changed contractual and pension commitments under Public Act 4. Public Act 4 is not Michigan's first law governing emergency managers, but it is the first legislation that allowed emergency managers to break collective bargaining agreements and to ignore retirement commitments. Mich. Comp. Laws §§ 141.1501-1531 (rejected by referendum 2012). In 1990, the Michigan Legislature enacted a predecessor to Public Act 4, the Local Government Fiscal Responsibility Act ("Public Act 72"). Mich. Comp. Laws § 141.1519(1)(j) (2005). Public Act 72 established a procedure for Michigan's Governor to appoint emergency managers, and gave those emergency managers the power to address local governments' financial crises. But Public Act 72 did not give emergency managers the power to modify collective bargaining agreements or pension rights. Critics of Public Act 72 complained that it did not give emergency managers the powers sometimes necessary to address municipalities' structural budget problems, especially financial problems flowing from pension commitments. Critics called for a new law, and Public Act 4 was born.

In March 2011, Michigan's Governor signed Public Act 4 into law. § 141.1503. Unlike Public Act 72, Public Act 4 gave emergency managers the power to temporarily reject, modify, or terminate existing collective bargaining agreements. *Id.* at §§ 141.1519(1)(k), (k)(iv). Public Act 4 also repealed Public Act 72. *Id.* at § 141.1503 (enacting § 1).

As we discuss, Michigan's Constitution purposely makes it difficult for laws to take immediate effect. Generally, laws do not become effective until ninety days after the end of the legislative session in which they are passed. Mich. Const. art. IV, § 27.

However, this general rule does not apply if two-thirds of each house in the Legislature vote to make the law take immediate effect. *Id.* Public Act 4 passed by only a narrow margin. Nevertheless, the Michigan Legislature claims that two-thirds of its members voted to make Public Act 4 become immediately effective.

Michigan also has a voter rejection procedure that allows citizen-initiated rejection of Michigan legislation. In response to Public Act 4, critics collected enough signatures to have Michigan citizens vote on whether Public Act 4 should be rejected.[1] On November 6, 2012, Michigan voters rejected Public Act 4 by a fifty-two percent to forty-eight percent margin. Michigan's citizens cancelled Public Act 4.

Apparently unaffected that voters had just rejected Public Act 4, the Michigan Legislature enacted, and the Michigan Governor signed, Public Act 436. Public Act 436 largely reenacted the provisions of Public Act 4, the law that Michigan citizens had just revoked. In enacting Public Act 436, the Michigan Legislature included a minor appropriation provision, apparently to stop Michigan voters from putting Public Act 436 to a referendum.[2] Mich. Comp. Laws §§ 141.1574, 1575.

### B. City of Pontiac

In March 2009, Michigan's Governor appointed Schimmel as Pontiac's emergency manager under Public Act 72, Michigan's then-controlling emergency manager law. Although Schimmel has managed Pontiac for a number of years, Pontiac continues to struggle. Currently, Pontiac's liabilities to the benefit plans of its employees is its greatest expense, totaling $302 million.

---

[1] In August 2012, after litigation over the petition, the Michigan Supreme Court ordered the Board of State Canvassers to certify the referendum for the November ballot. *Stand Up for Democracy v. Sec'y of State*, 822 N.W.2d 159, 161 (Mich. 2012). That certification suspended the operation of Public Act 4 pending the outcome of the referendum. Mich. Comp. Laws § 168.477(2) ("a law that is the subject of the referendum continues to be effective until the referendum is properly invoked").

[2] *See* Mich. Const. Art. II, § 9 ("The power of referendum does not extend to acts making appropriations for state institutions or to meet deficiencies in state funds").

With the passage of Public Act 4 and for the first time, Michigan gave emergency managers the power to change collective bargaining agreements and the power to stop pension benefits.  In December 2011, the Emergency Manager modified Pontiac's collective bargaining agreements to shift a large portion of  the city's benefits obligations onto its employees.[3]  Among the changes, Pontiac cancelled disability, vision, and hearing coverage; increased annual deductibles; and cut pensions.  This case resulted.

### C. Procedural History

In June 2012, the City of Pontiac Retired Employees Association and a group of retired employees (collectively the "Retired Employees") filed this putative class action. They alleged several federal claims, including the unconstitutional impairment of contract, preemption under federal bankruptcy law, and deprivation of a property interest without due process of law.  With the complaint, the Retired Employees filed a motion for a temporary restraining order ("TRO") and a motion for a preliminary injunction to stop certain Emergency Manager orders from taking effect.  In July 2012, the district court denied the TRO motion and denied the motion for a preliminary injunction.  The Retired Employees appealed.

## II. Law and Analysis

As became clear during oral argument, both parties ask this Court to reach the substantive merits of their dispute.  But doing so requires us to resolve important federal constitutional issues, which are closer questions than the dissent suggests.  Unlike the district court here, another Michigan federal district granted injunctive relief when faced with similar federal questions.[4]  Against this backdrop, the better course of action asks the district court to see if state-law issues could avoid the need to rule on the federal claims.  Because state law could provide an alternative basis for deciding this case, the

---

[3]The Pontiac collective bargaining agreements at issue deal primarily with healthcare benefits.

[4]*See Welch v. Brown*, No. 12–13808, 2013 WL 1292373, at *13 (E.D. Mich. March 29, 2013).

more prudent approach is to allow the district court to conduct additional fact-finding and to consider the state-law issues.

### A. *Constitutional Avoidance*

Under the doctrine of constitutional avoidance, we avoid constitutional determinations when a case can be resolved on other grounds. *See Ashwander v. TVA*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring) ("It is not the habit of the court to decide questions of a constitutional nature unless absolutely necessary to a decision of the case.") (internal citation and quotation marks omitted); *see also Muller Optical Co. v. EEOC*, 743 F.2d 380, 386 (6th Cir. 1984) ("The duty to avoid decisions of constitutional questions . . . [is] based upon the general policy of judicial restraint."). When a case can be resolved on state constitutional grounds, we should decide the state issue so as to avoid rendering a decision under the Federal Constitution. *See Siler v. Louisville & Nashville R.R. Co.*, 213 U.S. 175, 191 (1909) ("This court has the same right, and can, if it deem it proper, decide the local questions only, and omit to decide the federal questions, or decide them adversely to the party claiming their benefit.") (citations omitted).

The dissent would decide the Retired Employees' contracts clause and due process claims. But these federal constitutional issues are closer questions than the dissent suggests. If the Michigan Legislature gave Public Act 4 immediate effect in violation of the Michigan Constitution, or if the voters' rejection of Public Act 4 by referendum rendered the Emergency Manager's actions void, we could avoid the federal constitutional issues. Doing otherwise forces us to decide federal constitutional questions and potentially render an advisory opinion. We should avoid this if we can.

### B. *Waiver*

What should a court do when the parties fail to raise an obvious issue? Here, neither the Retired Employees nor Schimmel raised the issue of whether the Michigan Legislature's giving Public Act 4 immediate effect violated the Michigan Constitution.

Nor did they raise the issue of whether the voters' referendum rejection of Public Act 4 rendered the Emergency Manager's actions void.  Both issues are potentially dispositive of this appeal.

Generally, we have found that a party waives an issue when they have not raised it or sufficiently addressed it.  *See, e.g.*, *Marks v. Newcourt Credit Grp., Inc.*, 342 F.3d 444, 462 (6th Cir. 2003) (holding that a party "waives an issue when he fails to present it in his initial briefs") (citations omitted).  But, the waiver rule is neither jurisdictional nor is it absolute.  *See, e.g.*, *In re Morris*, 260 F.3d 654, 664 (6th Cir. 2001) (holding that the waiver rule is "an accepted practice or rule of procedure rather than a jurisdictional bar to hearing issues for the first time on appeal") (citations omitted).

The dissent says that we are bound by the parties' framing of the issues.  But the United States Supreme Court rejects a blanket rule.  In *Independent Insurance Agents of America*, the Court held that courts of appeals have the discretion to consider issues *sua sponte* despite the parties' failure to raise the issue in the district court, the court of appeals, or at oral argument.  *U.S. Nat. Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 445-47 (1993) ("The contrary conclusion would permit litigants, by agreeing on the legal issue presented, to extract the opinion of a court on hypothetical Acts of Congress or dubious constitutional principles, an opinion that would be difficult to characterize as anything but advisory.").[5]

---

[5]There, the United States Court of Appeals for the District of Columbia Circuit reversed the district court's judgement based on a theory that neither party argued to the district court or the court of appeals.  *See Indep. Ins. Agents of Am., Inc. v. Clarke*, 955 F.2d 731 (D.C. Cir. 1992), *rev'd on other grounds sub nom. Indep. Ins. Agents of Am.*, 508 U.S. at 445-47.  In denying rehearing *en banc*, Judge Sentelle said:

> Our colleagues question the "judicial power" of a federal court to decide an issue of law concededly dispositive of the case where parties have not raised the issue. I think it most apparent that federal courts do possess this power. The alternative is that the parties could force a federal court to render an advisory opinion. What the dissenters in effect argue is that the parties can stipulate to the state of underlying law; frame a law suit, assuming that stipulation; and obtain from the court a ruling as to what the otherwise dispositive law would be if the stipulated case were in fact the law.

*Clarke*, 965 F.2d at 1078 (Sentelle, J., concurring).

After the Supreme Court granted *certiorari*, the respondents argued that the court of appeals erred in considering the issue *sua sponte*.  *Indep. Ins. Agents of Am.*, 508 U.S. at 445.  Here, the dissent attempts to revive that argument.  But, the Supreme Court dismissed the argument made by the dissent, the *Clarke*

Despite the importance of whether Public Act 4 should have been given immediate effect, or if the voter's referendum rejection of Public Act 4 rendered the Emergency Manager's actions void, we should not decide these issues now because the parties failed to develop these issues sufficiently for our review. In *Independent Insurance Agents of America*, the Supreme Court found that the court of appeals' *sua sponte* consideration of the unasserted issue was proper only after "giving the parties ample opportunity to address the issue." *Id.* at 448.

Thus, we return these issues to the district court to develop a factual record and consider the parties' arguments. We have generally applied the waiver exception where the issue involved a question of law that required no additional factual development. *See, e.g.*, *Morris*, 260 F.3d at 664. But here, where additional fact-finding is necessary, remand to the district court is more appropriate. *See*, *e.g.*, *City of Mt. Clemens v. EPA*, 917 F.2d 908, 916 n.7 (6th Cir. 1990) (remanding to district court and declining to affirm on alternative grounds "[b]ecause these arguments were not addressed by the district court and additional fact finding would be required to resolve the issues raised").[6] The parties' failure to brief important state-law questions should not force this Court to decide important federal constitutional questions. A remand is therefore the best course of action.

In January 2013, after this Court heard oral argument, Michigan's Attorney General moved to intervene to brief the referendum rejection issue. While the Attorney General's supplemental briefing may aid a fact-finder considering these issues, the district court should conduct that fact-finding. *See Birth Control Ctrs., Inc. v. Reizen*, 743 F.2d 352, 366 (6th Cir. 1984) ("When an appellate court discerns that additional fact findings are necessary, the usual rule is to remand for further proceedings to permit the

---

dissenters, and the respondents. *Id.* at 446-47.

[6] *See also Burkholder v. UAW Local No. 12*, 299 F. App'x 531, 534 (6th Cir. 2008), *overruled on other grounds by Chapman v. UAW Local 1005*, 670 F.3d 677 (6th Cir. 2012); *Dandridge v. Williams*, 397 U.S. 471, 476 n.6 (1970) ("When attention has been focused on other issues, or when the court from which a case comes has expressed no views on a controlling question, it may be appropriate to remand the case rather than deal with the merits of that question in this Court.").

trial court to make the necessary findings."). The motion to intervene is therefore denied.[7] Our decision is limited to this proceeding. On remand, the Attorney General may refile its motion with the district court.

### C. Immediate Effect

On remand, the district court should consider whether the Michigan Legislature violated the Michigan Constitution when it gave Public Act 4 "immediate effect." There is reason to believe that it did.

Generally, the Michigan Constitution makes bills effective ninety days after the end of the legislative session in which they are passed. Mich. Const. art. IV, § 27. That general rule, however, is subject to the immediate effect exception that permits the Legislature to "give *immediate effect* to acts by a *two-thirds vote* of the members elected to and serving in each house." *Id.* (emphasis added).

Discussing the framers' intent for this provision, the Michigan Supreme Court said:

> Several delegates expressed concern that granting the Legislature the power to give immediate effect to any law would endanger the referendum because it would not give the people time to gather signatures for petitions to prevent the law from going into effect. Also, there was the danger that statutes would be passed without giving people adequate time to become acquainted with the statutes and adjust to them before they went into effect. To reduce this danger, the framers decided to maintain the requirement that no act passed by the Legislature could take immediate effect *unless passed by a two-thirds vote of the elected members of each house*.

*Frey v. Dep't of Mgmt. & Budget*, 414 N.W.2d 873, 880-81 (Mich. 1987) (emphasis added) (footnotes omitted).

---

[7]The dissent would grant the motion to intervene and direct the Michigan Attorney General to file his brief within twenty-eight days.

The Michigan Legislature seems to have ignored the two-thirds vote requirement when it gave Public Act 4 immediate effect. The Michigan Legislature has a Senate with thirty-eight members and a House with 110 members. Thus, the two-thirds vote requirement is twenty-six votes in the Senate and seventy-four votes in the House. But, Public Act 4 passed in the House with sixty-two votes—twelve short of the two-thirds requirement for an immediate effect motion. Yet, despite the clear absence of the necessary two-thirds vote, the House proceeded to give Public Act 4 immediate effect over the objections of the minority party.[8]

To achieve this result, the House used a rule that allows it to conduct a "rising vote," where the presiding officer examines the chamber to see whether the requisite two-thirds support exists. *See Hammel v. Speaker of House of Representatives*, 825 N.W.2d 616, 619 (Mich. Ct. App. 2012), *appeal denied*, 829 N.W.2d 862 (Mich. 2013). Apparently, a two-thirds vote occurs whenever the presiding officer says it occurs—irrespective of the actual vote. This authority is unchecked and often results in passing motions for immediate effect that could not receive the constitutionally required two-thirds vote. Apparently, the Michigan Legislature believes the Michigan Constitution can be ignored.

Public Act 4 exemplifies the farce. The Michigan House presiding officer refused a request for a roll call vote and made Public Act 4 immediately effective through the obvious fiction that twelve House members immediately changed their positions. This process has been the subject of considerable contention and scrutiny.[9]

---

[8]Rep. Kandrevas made the statement: "I vote NO . . . and protest the events that transpired on the floor today. . . . [including] an utter disregard for demands by the requisite number of voting members for a record roll call vote on the question of Immediate Effect."

[9]*See, e.g.*, Mark Brush, *Michigan Court of Appeals Rejects House Dems Bid to Stop 'Immediate Effect'*, Michigan Radio (Aug. 16, 2012, 5:28 PM), http://www.michiganradio.org/term/immediate-effect; Paul Egan, *Michigan Court of Appeals Debates Republican Legislature's Immediate Effect*, Detroit Free Press (Aug. 8, 2012, 12:40 PM), http://www.freep.com/apps/pbcs.dll/article?AID=/201208081240/NEWS15/120808051; Libby Spencer, *Michigan House Republicans Repeatedly Violated State Constitution,* The Detroit News (Apr. 6, 2012, 4:13 PM), http://blogs.detroitnews.com/politics/2012/04/06/michigan-house-republicans-repeatedly-violated-state-constitution/; Jennifer White, *Immediate Effect Sheds National Light on Michigan, So What?*, Michigan Radio (Apr. 12, 2012, 9:39 PM),

In effect, the Michigan Legislature has made their "rising vote" rule trump the Michigan Constitution.

Despite the Michigan Constitution's express limitation, the Legislature has perverted the immediate effect exception to swallow the constitutional rule. Under Republican control of the House, in 2011, the Legislature passed 319 out of 323 bills with immediate effect. In 2010, it passed 345 out of 363 bills with immediate effect. Democrats have also abused the exception. Under Democratic control of the House, in 2006, the Legislature passed 664 out of 682 bills with immediate effect. Plainly, the Legislature will not self-correct its abuse of the immediate effect exception because the majority party controls and benefits from the process.

The issue has been examined by Michigan's lower courts. *See Hammel*, 825 N.W.2d at 618. In *Hammel*, the plaintiffs said that under the Michigan Constitution, "article 4, § 27, motions for immediate effect are required to be resolved by a roll call vote, and that article 4, § 18 prohibits a requirement that motions for immediate effect and for a roll call vote be made orally." *Id.* at 619. The trial court agreed and entered an order for a preliminary injunction. *Id.*

But the Michigan Court of Appeals reversed. *Id.* at 623. It found that the plaintiffs had failed to demonstrate a likelihood of success on the merits because "[t]he constitutional provisions at issue permit the manner in which they are applied to be determined by adoption of the rules of the House." *Id.* at 622. This reasoning make little sense. The Michigan Constitution expressly limits the Legislature's power to give laws immediate effect. Yet, the Michigan Court of Appeals says that the Michigan Legislature has the power to decide whether that constitutional limitation applies? Alternatively, the court of appeals also made the illogic finding that the plaintiffs failed

---

http://www.michiganradio.org/post/immediate-effect-sheds-national-light-michigan-so-what; Paul Egan, *Michigan House Democrats Lose Challenge to GOP's Voice Votes that Give Laws Immediate Effect* (Aug. 17, 2012), http://www.freep.com/article/20120817/NEWS15/308170058/Michigan-House-Democrats-lose-challenge-to-GOP-s-voice-votes-that-give-laws-immediate-effect.

to show irreparable harm because the "plaintiffs' ability to vote and the effectiveness of their vote have not been impaired." *Id.*

On May 1, 2013, the Michigan Supreme Court denied the plaintiffs' application for leave to appeal the *Hammel* case. *Hammel v. Speaker of House of Representatives*, 829 N.W.2d 862 (Mich. 2013). The dissent here characterizes the Michigan Supreme Court's review as somehow affirming the *Hammel* opinion. But the Michigan Supreme Court simply has not spoken on the immediate effect issue and no conclusion can be taken from its declining to review the case.

Where "a state's highest court has spoken to an issue, we are bound by that decision unless we are convinced that the high court would overrule it if confronted with facts similar to those before us." *Kirk v. Hanes Corp. of N.C.*, 16 F.3d 705, 707 (6th Cir. 1994) (citation omitted). Where a state appellate court has resolved an issue to which the high court has not spoken, the Supreme Court has said that the appellate court decision "is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *W. v. AT&T Co.*, 311 U.S. 223, 237 (1940). "We may refuse to follow intermediate appellate court decisions where we are persuaded that they fail to reflect state law correctly, but we 'should not reject a state rule just because it was not announced by the highest court of the state,' even if we believe that the rule is 'unsound.'" *Ziebart Int'l Corp. v. CNA Ins. Cos.*, 78 F.3d 245, 250-51 (6th Cir. 1996) (quoting *FL Aerospace v. Aetna Cas. & Sur. Co.*, 897 F.2d 214, 218-19 (6th Cir. 1990)).

On remand, the district court should consider whether the Michigan Supreme Court would overrule *Hammel*. There is reason to believe it would. The Michigan constitutional provision seems obviously directed at restricting its Legislature's ability to give bills immediate effect unless a real two-thirds of the elected members in each house agree. And the court of appeals's belief that house members do not need to vote on immediate effect if they have had a chance to vote on the underlying legislation turns Michigan's Constitution article IV, § 27 on its head.

Michigan courts do not refrain from scrutinizing the Legislature's determination that a bill is passed with immediate effect. First, before 1963, the Michigan Constitution imposed additional requirements on the Legislature before it could give a bill immediate effect: it said that the bill must be "immediately necessary for the preservation of the public peace, health or safety." *Indus. Bank of Wyandotte v. Reichert*, 232 N.W. 235, 236 (Mich. 1930). At that time, when the Legislature said a bill should take immediate effect, courts reviewed the Legislature's determination to ensure that the bill was immediately necessary for those reasons. *See, e.g.*, *Attorney Gen. v. Lindsay*, 145 N.W. 98, 103 (Mich. 1914) ("The determination of the Legislature by giving [the act] immediate effect is not conclusive upon the courts, and they must decide, as a matter of law, whether the act so declared is . . . within this constitutional provision. This is clearly a judicial question.").[10] Likewise, courts should review the Legislature's compliance with the Michigan Constitution's two-thirds vote requirement to give a bill immediate effect.

Second, in the federal system, the Supreme Court has said that courts should review congressional procedural rules to determine if they violate the Constitution. *See, e.g.*, *United States v. Ballin*, 144 U.S. 1, 5 (1892) ("The constitution empowers each house to determine its rules of proceedings. *It may not by its rules ignore constitutional restraints* or violate fundamental rights.") (emphasis added). A contrary rule—that the Legislature's creation of procedural rules is not limited by constitutional restraints—could lead to absurd results. The Michigan Legislature cannot end the Michigan Constitution's two-thirds requirement by passing a rule saying it will ignore the requirement. To conclude otherwise would effectively allow the Michigan Legislature to unilaterally amend the Michigan Constitution.

---

[10]*See also People v. Asta*, 72 N.W.2d 282, 287 (Mich. 1955) ("It may fairly be said that the imposition of the specific tax in question and amendment to the act in question have to do with the public peace, health and safety."); *Newberry v. Starr*, 225 N.W. 885, 887 (Mich. 1929) ("The act relates to important state agencies having to do with preservation of public health, peace, and safety."); *Mich. Taxpayers United, Inc. v. Governor*, 600 N.W.2d 401, 403 (Mich. Ct. App. 1999) ("Whether the Legislature properly gave immediate effect to the bill is a question of law that we review de novo.") (citation omitted).

Because the Legislature gave Public Act 4 immediate effect, the bill purportedly became effective on March 16, 2011, after the governor signed it into law. In December 2011, the Emergency Manager gave the orders we review in this case. Those orders modified the retirement plans of over 1000 municipal retirees. But, if the Legislature's attempt to give Public Act 4 immediate effect violated the Michigan Constitution, then Public Act 4 would not have become effective until March 2012, ninety days after the legislative session ended. Consequently, the Emergency Manager would not have possessed the power to modify the employees' retirement plans when he did.

The district court, after conducting additional fact-finding, could conclude that the immediate effect issue resolves the case because the Emergency Manager did not have the power to modify the employees' retirement plans at the time he acted. Because the immediate effect issue is potentially dispositive and is a state-law ground, we remand to the district court.

## D. Rejection by Referendum

Even if the Michigan Legislature's passage of Public Act 4 with immediate effect did not violate the Michigan Constitution, remand is also warranted to allow the district court to consider whether the voters' November 2012 referendum of Public Act 4 voided the Emergency Manager's actions. After Michigan voters rejected Public Act 4, do actions taken under Public Act 4 continue to have effect?

In an August 6, 2012, opinion (the "Referendum Opinion"), the Michigan Attorney General said that:

> If 2011 PA 4 [Public Act 4] is disapproved by voters pursuant to the power of referendum under Const 1963, art 2, § 9, *that law will no longer have any effect* and the formerly repealed law, 1990 PA 72 [Public Act 72], is permanently revived upon certification of the November 2012 general election results.
>
> Once the effect of 2011 PA 4 [Public Act 4], the Local Government and School District Fiscal Accountability Act, MCL 141.1501 et seq., was suspended under Const 1963, art 2, § 9 and MCL 168.477(2), the prior repealed law, 1990 PA 72 [Public Act 72], is revived until certification

of the November 2012 general election results. Depending on the vote of the electorate, the temporary revival of 1990 PA 72 [Public Act 72] will either cease with the approval of Public Act 4, or become permanent with the Act's disapproval.

2012 Mich. Op. Att'y Gen. No. 7267 (Aug. 6, 2012) (emphasis added). On November 6, 2012, Michigan voters rejected Public Act 4 by a 52-percent to 48-percent margin.

Nevertheless, the effect of the referendum on actions that the Emergency Manager took before the rejection is uncertain. First, Proposal 12-1, the referendum on Public Act 4, does not expressly say what effect referendum rejection would have on past Emergency Manager actions. The referendum text did not specifically say whether a rejection would invalidate past Emergency Manager actions. Moreover, the text accompanying the referendum was merely the full text of Public Act 4. Neither the ballot text nor its accompanying explanatory text stated the effect of rejection on past Emergency Manager actions.

Second, the Michigan Constitution does not say what effect a referendum rejection of Public Act 4 would have. The Michigan Constitution gives voters the power to approve or reject laws enacted by the Legislature. It provides, in relevant part:

> The people reserve to themselves . . . the power to approve or reject laws enacted by the legislature, called the referendum . . . . The power of referendum does not extend to acts making appropriations for state institutions or to meet deficiencies in state funds and must be invoked in the manner prescribed by law within 90 days following the final adjournment of the legislative session at which the law was enacted. To invoke the initiative or referendum, petitions signed by a number of registered electors, not less than eight percent for initiative and five percent for referendum of the total vote cast for all candidates for governor at the last preceding general election at which a governor was elected shall be required.

Mich. Const. art. II, § 9.[11]

---

[11] The record of the 1963 constitutional convention is also unhelpful. *See* Secretary of the Convention, State of Michigan Constitutional Convention Official Record 2955-56 (Austin C. Knapp ed., 1962).

The Michigan Constitution thus merely outlines the referendum process. It does not say what effect a referendum rejection has on action taken under the rejected statute, but before the referendum. While Michigan Compiled Laws § 168.477(2) says that "a law that is the subject of the referendum continues to be effective until the referendum is properly invoked," § 168.477(2) controls only to suspend operation of the challenged statute until the voters' decide the referendum. Put simply, "properly invoked" more likely describes certification of the referendum for the ballot, and § 168.477(2) does not control after rejection of the statute by the voters. The Michigan Constitution outlines only the procedures for, and not the effect of, referendum.

Third, in Public Act 436, the successor to Public Act 4, the Michigan Legislature arguably expressed doubt about the lawfulness of Emergency Manager action taken before the November 2012 referendum. Specifically, Public Act 436 provides:

> All proceedings and actions taken . . . under former 2011 PA 4 [Public Act 4], former 1988 PA 101, or former 1990 PA 72 [Public Act 72] before the effective date of this act are ratified and are enforceable as if the proceedings and actions were taken under this act.

Mich. Comp. Laws § 141.1544. Thus, by making prior Emergency Manager actions taken under Public Act 4 or Public Act 72 enforceable as if they were taken under Public Act 436, the Legislature seems to have anticipated that courts would find past Emergency Manager actions unlawful.[12] Consequently, it is arguable that even the Legislature expressed doubt about the lawfulness of past Emergency Manager actions in light of the voters' rejection of Public Act 4.

Fourth, in state court filings, the Michigan Attorney General has failed to cite to any authority supporting his position that the Emergency Manager's actions under Public Act 4 are valid after the referendum. To the contrary, in his brief to the Michigan

---

[12]On remand, the district court should also consider whether the Michigan Legislature possesses the power to retroactively immunize its own acts that the voters rejected by referendum. Because of the voters' rejection of Public Act 4 by referendum, and because Public Act 4 is substantially similar to Public Act 436, such a power could infringe on the voters' referendum power under the Michigan Constitution article II, § 9.

Supreme Court in *Davis v. Roberts*, 810 N.W.2d 555 (Mich. 2012), the Michigan Attorney General says that "the rejection of a law by referendum is *more powerful* than the repeal of a law because *the rejection erases the Legislature's and Governor's original enactment*." Opposition Brief for Appellee at 16 *Davis v. Roberts*, 810 N.W.2d 555 (Mich. 2012) (No. 146187) (emphasis added).

The Attorney General suggests that the referendum rendered prior Emergency Manager actions void. Yet, in the same brief, the Attorney General also says "[t]he voters' rejection does not render [Public Act 4] void *ab initio* since it was lawfully enacted by the Legislature in the first instance. Thus the disapproval has no effect on lawful actions taken by the emergency managers during the time [Public Act 4] was effective." *Id*. at 21. Despite recognizing that a "referendum is more powerful than a repeal," and despite saying that the referendum "erase[d]" Public Act 4, the Michigan Attorney General seems to argue the inconsistent position that the Emergency Manager's action under Public Act 4 are valid after the referendum. The district court should consider this issue after more specific briefing. Consequently, we remand to the district court so that it can decide if the voters' referendum rendered the Emergency Manager's actions void.

### III. Conclusion

We refuse to rush to decide federal constitutional issues. Because the immediate effect issue and the referendum issue are state-law grounds on which the Court could decide this case, we vacate and remand to the district court to conduct additional fact-finding and consider these issues.

––––––––––––––––

**DISSENT**

––––––––––––––––

GRIFFIN, Circuit Judge, dissenting.  The majority remands the case to the district court on the grounds that issues of state law never raised by the parties "could" provide an alternative basis for deciding this case.  In doing so, the majority misapplies the constitutional avoidance doctrine, directs the district court to address issues more appropriately left to the Michigan courts, and unjustifiably departs from our well-established principles of appellate review that generally bar this court from deciding issues that are not argued, preserved, or ruled upon by the lower court or tribunal.  In my view, only the federal constitutional issues raised by the parties are properly before us. Addressing those issues, I would affirm the district court's judgment because it did not abuse its discretion when it denied the Retired Employees' request for injunctive relief. In addition, I would  grant the Michigan Attorney General's motion to intervene. Accordingly, I respectfully dissent.

I.

In enacting 2011 PA 4, the Michigan Legislature recognized that "the health, safety, and welfare of the citizens of this state would be materially and adversely affected by the insolvency of local governments" and "the fiscal accountability of local governments is vitally necessary . . . to assure the provision of necessary governmental services essential to public health, safety, and welfare." Mich. Comp. Laws § 141.1503. The law permitted the "state to take action and to assist a local government in a condition of financial stress or financial emergency . . . by requiring prudent fiscal management and efficient provision of services, permitting the restructuring of contractual obligations, and prescribing the powers and duties of state and local government officials and emergency managers." *Id.*  It authorized emergency managers ("EMs") to temporarily reject, modify, or terminate existing collective bargaining

agreements ("CBAs") if certain conditions were met.  *Id*. at § 141.1519(1)(k), (k)(iv).
It also allowed them to adopt or amend ordinances.  *Id*. at § 141.1519(1)(dd).

The City of Pontiac has experienced difficult economic times and has been operating under an emergency manager for many years.  For the fiscal year ending June 30, 2008, the city budget deficit was $7,007,957; for the fiscal year ending June 30, 2009, the deficit was $5,607,638; and for the fiscal year ending June 30, 2010, the deficit was $4,089,199.  For the fiscal year ending June 30, 2011, the budget indicates that there was a surplus of $554,732, but apparently only because the City of Pontiac failed to make certain contributions in excess of $11 million.  For the fiscal year ending June 30, 2012, the budget projects a deficit of $8,376,527.  For the fiscal year ending June 30, 2013, the budget projects that expenses will exceed revenue by $5,903,485.

For the fiscal year ending June 30, 2013, although a budget surplus is expected from the sale of a wastewater treatment facility, which is to be transferred to Oakland County, the EM believes that declining property taxes and unfunded liabilities continue to create a structural deficit in the city budget.  The City of Pontiac's unfunded liability to the General Employees Healthcare System is over $221 million, and its unfunded liability to the Police and Fire System is over $81 million.  At present, retiree healthcare is the City of Pontiac's largest expense.  For the fiscal year ending June 30, 2013, it will spend $13.5 million on medical and dental insurance coverage, of which only $1.2 million is for current employees.

Over the years, the City of Pontiac has negotiated numerous CBAs under which it has contracted to provide health insurance coverage for certain municipal retirees.  In addition, with regard to non-union retirees, Chapter 92 established a plan and trust "to provide health care and life insurance benefits . . . for the welfare of certain retirees of the city who are eligible to receive a retirement benefit . . . and the spouses and eligible dependents of such retirees through a prefunded group health and insurance benefits plan."  The City of Pontiac has also promised certain health insurance benefits by virtue of separation agreements and past practice.

At issue in this case are the EM's actions, made pursuant to PA 4, to address the City of Pontiac's financial troubles. In a series of orders issued in December 2011, the EM modified CBAs and other agreements in such a way that shifted the cost of prescriptions and insurance co-payments onto retirees. The EM also repealed Chapter 92.

The Retired Employees filed a class action in federal court, asserting the following federal claims: (1) impairment of contract under the federal constitution; (2) federal preemption in the area of municipal debt reduction; and (3) deprivation of a property interest without due process of law. On these grounds, among others, the Retired Employees asked the district court to enjoin the City of Pontiac from implementing proposed changes to their healthcare benefits and to reinstate their coverage to previous levels.

The district court denied the Retired Employees' request for injunctive relief, and this appeal followed. The issues presented in this case and controversy are limited to whether the Retired Employees are entitled to injunctive relief based on an unconstitutional impairment of contract, preemption under federal bankruptcy law, or deprivation of a property interest without due process of law.

II.

Rather than address the issues ruled on below and raised by the parties on appeal, the majority contrives "potentially dispositive" state-law grounds for resolving this case, under the guise of "constitutional avoidance." Specifically, the majority questions whether PA 4 was properly given immediate effect and whether the EM's past actions remain valid in light of the voters' rejection by referendum. Having raised these issues *sua sponte*, the majority directs the district court to address them on remand.

In doing so, the majority misunderstands and misapplies the constitutional avoidance doctrine. As explained in *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 346 (1936) (Brandeis, J., concurring), "[t]he Court developed . . . a series of rules under

which it has avoided passing upon a large part of all the constitutional questions pressed upon it for decision." Among them is the rule against "anticipat[ing] a question of constitutional law in advance of the necessity of deciding it." *Id*. (internal quotation marks omitted). "It is not the habit of the court to decide questions of a constitutional nature unless absolutely necessary to a decision of the case." *Id*. (internal quotation marks omitted). This avoidance principle does not apply here, first, because the federal constitutional questions raised in this case are not "anticipated." Rather, the issues were ruled on below and are properly presented on appeal. We unquestionably have jurisdiction to "adjudge the legal rights of litigants in actual controversies." *Liverpool, N.Y. & P. S.S. Co. v. Comm'rs of Emigration*, 113 U.S. 33, 39 (1885).

Second, the constitutional avoidance doctrine presumes that a nonconstitutional ground for resolving the case is properly before the court. *Ashwander*, 297 U.S. at 347 (Brandeis, J., concurring). "The Court will not pass upon a constitutional question although properly presented by the record, if there is also *present* some other ground upon which the case may be disposed of." *Id*. (emphasis added). The majority asserts that we should not allow the litigants to force us into deciding constitutional questions, apparently believing that courts are responsible for framing the issues. This is not so. "[W]e rely on the parties to frame the issues for decision," as "[o]ur adversary system is designed around the premise that the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief." *Greenlaw v. United States*, 554 U.S. 237, 243, 244 (2008) (internal quotations marks omitted); *accord Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir. 1983) (Scalia, J.) ("The premise of our adversarial system is that appellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them.").

In addition, we should not avoid a constitutional question when its resolution is necessary to dispose of the case. *Ashwander*, 297 U.S. at 347 (Brandeis, J., concurring). Here, the majority concedes that the state issues are merely "potentially dispositive." Although offering an opinion on their resolution, the majority admits that the case cannot

be decided on the basis of state law "because the parties have failed to develop these issues sufficiently for our review." Indeed, the parties have failed to argue or develop them at all.

Just as the majority is incapable of deciding the case on state-law grounds, there is no reason to believe that the district court will be able to do so on remand. The Michigan Constitution provides that "the legislature may give immediate effect to acts by a two-thirds vote of the members elected to and serving in each house." Const. 1963, art. 4, § 27. Significantly, whether the House passes an act and whether it gives it immediate effect are two separate votes. For example, the House passed HB 4246 and HB 4929 by less than a two-thirds vote, yet two-thirds of the House voted orally in favor of their immediate effect. *Hammel v. Speaker of House of Representatives* (*Hammel I*), 825 N.W.2d 616, 619 (Mich. Ct. App. 2012). Thus, the mere fact that the House passed PA 4 short of a two-thirds vote is not reason to doubt the validity of its immediate effect.

In *Hammel I*, the plaintiffs sought to enjoin the immediate effect of HB 4246 and HB 4929, arguing that the Michigan Constitution required a role call vote on the record, but the Michigan Court of Appeals rejected the argument. The court explained that "[a] general challenge to the governing procedures in the House of Representatives is not appropriate for judicial review."[1] *Id.* The court also observed that the House rule allowing motions for immediate effect to be resolved by a rising vote did not conflict with the plain language of § 27, and, in any case, the plaintiffs did not challenge the House rule. *Id.* at 621. According to the court, an injunction was improper because "[t]he constitutional provisions at issue permit the manner in which they are applied to be determined by adoption of the rules of the House, which [the] plaintiffs concede they do not challenge, and which we do not oversee." *Id.* at 622. The Michigan Supreme

---

[1]The majority is correct that, before 1963, the Michigan courts would scrutinize whether the legislature properly passed a bill with immediate effect. At the time, the state constitution limited the availability of immediate effect to "acts immediately necessary for the preservation of the public peace, health or safety," Mich. Const. 1908, art. 5, § 21, and courts would review the legislative determination of public necessity, see *Attorney General ex rel. Barbour v. Lindsay*, 145 N.W. 98, 103 (Mich. 1914). The Michigan Constitution no longer imposes a public necessity requirement. *See* Mich. Const. 1963, art. 4, § 27.

Court denied the plaintiffs' application for leave to appeal. *Hammel v. Speaker of the House of Representatives* (*Hammel II*), 829 N.W.2d 862 (Mich. 2013). Thus, *Hammel I* is the law of Michigan. Contrary to the majority's assertion, I do *not* characterize *Hammel II* "as somehow affirming" *Hammel I*. Rather, I characterize *Hammel II* as a denial of leave to appeal, the effect of which leaves *Hammel I* intact. Michigan Court Rule 7.215(J)(1) provides that published decisions of the Michigan Court of Appeals issued on or after November 1, 1990, are precedentially binding on subsequent panels of the Michigan Court of Appeals. Accordingly, *Hammel I* is precedent on this issue until or unless it is overruled by the Michigan Supreme Court.

The majority apparently disagrees with the *Hammel I* decision. According to the majority, the reasoning in *Hammel I* on this issue of state law "make[s] little sense." But because "lower federal courts are precluded from exercising appellate jurisdiction over final state-court judgments," it is unclear what the majority hopes to be accomplished on remand. *Marks v. Tennessee*, 554 F.3d 619, 622 (6th Cir. 2009) (internal quotation marks omitted). A federal court is bound by a state appellate court's judgment on a question of state law "absent a *strong showing* that the state's highest court would decide the issue differently." *Kirk v. Hanes Corp. of N.C.*, 16 F.3d 705, 707 (6th Cir. 1994) (internal quotation marks omitted); *accord West v. AT&T*, 311 U.S. 223, 237 (1940) (explaining that a federal court lacks authority to disregard a state appellate court's judgment on a question of state law "unless it is convinced . . . that the highest court of the state would decide otherwise"). Where, as here, "the highest court has refused to review the lower court's decision," the possibility that it will reach a conclusion contrary to that decision at a later date "remains a matter of conjecture." *West*, 311 U.S. at 237–38. Thus, because there does not exist a "strong showing" that the Michigan Supreme Court would reach a contrary conclusion, *Hammel I* is binding on federal courts, and, consequently, the federal district court has no basis to question the validity of PA 4's immediate effect on remand.

It is also inappropriate to direct the district court to review whether the rejection by referendum of PA 4 rendered the EM's past actions void. The Michigan courts have

not squarely addressed this issue.  The Michigan courts are in a better position to rule on novel questions of Michigan law.  *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 560 (6th Cir. 2008).  It is especially inappropriate for a federal court to rule on an unanswered question of state law *sua sponte*.  In *United States National Bank of Oregon v. Independent Insurance Agents of America*, 508 U.S. 439, 446–47, cited by the majority, the United States Supreme Court approved the D.C. Circuit's *sua sponte* consideration of an issue of *federal* law, relying on the Article III federal judicial power, which "extend[s] to all Cases . . . arising under . . . the Laws of the United States."  Art. III, § 2, cl. 1.  However, the decision does not support a federal court's *sua sponte* consideration of novel questions of *state* law, as ordered here.  To my knowledge, the majority's chosen action is unprecedented.

The issues created by the majority have not been raised, decided, or preserved.  The Retired Employees have never (neither below nor on appeal) argued that PA 4 was improperly given immediate effect or its rejection by referendum rendered the EM's past actions void, thereby forfeiting those issues.  Moreover, the Retired Employees expressly waived the latter issue at oral argument.[2]  Imprudently, my colleagues have departed from our proper judicial role by becoming advocates in their zeal to create controversies that do not exist.

"As a general rule, appellate courts do not consider any issue not passed upon below."  *In re Morris*, 260 F.3d 654, 663 (6th Cir. 2001).  Our cases have developed three circumstances that justify departure from the general rule.  *Id*. at 664.  Under the exception relied on by the majority, although not passed upon below, this court may address issues presented with sufficient clarity and requiring no factual development where their resolution would promote the finality of litigation in the case.  *Id*.  Issues are presented with sufficient clarity when "extensively briefed" by both parties.  *United States v. Pickett*, 941 F.2d 411, 415 (6th Cir. 1991).  Here, the parties never raised the

---

[2]Courts frequently confuse the concepts of "waiver" and "forfeiture."  Waiver is the intentional relinquishment or abandonment of a known right, whereas forfeiture is the failure to make the timely assertion of a right. *United States v. Olano*, 507 U.S. 725, 733 (1993).  Here, there was an express waiver regarding one of the issues and a forfeiture of the other.

issues (much less extensively briefed them), and the majority concedes that the issues lack the factual development necessary for their resolution. More importantly, the resolution of the issues on remand will not serve the interest of finality, because the district court's decision will not be precedentially binding regarding Michigan law. *Doe v. Young Marines of the Marine Corps League*, 745 N.W.2d 168, 172 (Mich. Ct. App. 2007) ("We are not bound to follow a federal court's interpretation of state law[.]").

The cases relied on by the majority do not involve forfeited or waived issues. *See Dandridge v. Williams*, 397 U.S. 471, 476 n.6 (1970); *Burkholder v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., Local No. 12*, 299 F. App'x 531, 534 (6th Cir. 2008), *overruled on other grounds by Chapman v. UAW Local 1005*, 670 F.3d 677 (6th Cir. 2012); *City of Mt. Clemens v. EPA*, 917 F.2d 908, 916 n.7 (6th Cir. 1990). Rather, in those cases, the preserved issues raised and argued below were simply not addressed by the lower court. In such situation, "[w]hen attention has been focused on other issues, or when the court from which a case comes has expressed no views on a controlling question," the appellate court may find it appropriate to remand the case for additional factual development and resolution by the lower court. *Dandridge*, 397 U.S. at 476 n.6. But "forfeiture" or "waiver" is not the appropriate term for this occurrence. The majority's reliance on *Dandridge*, *Burkholder*, and *Mt. Clemens* is therefore misplaced.

In addition to dissenting from the consideration of waived and forfeited issues, I also respectfully dissent from the majority's order denying the Michigan Attorney General's motion to intervene. In the rare case when *sua sponte* consideration on appeal is proper, interested parties should be provided "ample opportunity to address the issue." *Indep. Ins. Agents of Am.*, 508 U.S. at 448. My colleagues disregard this principle. Having characterized the state-law issues as important and potentially dispositive of the case, the majority paradoxically denies the Attorney General's request to defend the state's position with respect to those issues. They do this despite the Attorney General's statutorily protected right to intervene in any matter in which the people of Michigan

may be interested.  *See* Mich. Comp. Laws § 14.28.  In my view, allowing intervention on remand provides inadequate recourse to the damage the majority has done already.

### III.

Only the federal constitutional issues ruled on below and raised by the parties on appeal are properly before us and therefore should be decided.  We review the district court's denial of injunctive relief for an abuse of discretion.  *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002).  We review a district court's underlying legal conclusions de novo and its factual findings for clear error.  *Ne. Ohio Coal. for the Homeless v. Husted*, 696 F.3d 580, 591 (6th Cir. 2012).  Our review is "highly deferential," and we will disturb the district court's determination "only if the district court relied upon clearly erroneous findings of fact, improperly applied the governing law, or used an erroneous legal standard."  *McNeilly v. Land*, 684 F.3d 611, 614 (6th Cir. 2012) (internal quotation marks omitted).

A district court evaluating a plaintiff's request for injunctive relief considers four factors:  (1) the plaintiff's likelihood of success on the merits; (2) whether the plaintiff will suffer irreparable injury without a preliminary injunction; (3) whether issuance of a preliminary injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of a preliminary injunction.  *Id.* at 615. "When a party seeks a preliminary injunction on the basis of a potential constitutional violation, 'the likelihood of success on the merits often will be the determinative factor.'"  *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) (quoting *Jones v. Caruso*, 569 F.3d 258, 265 (6th Cir. 2009)).  The burdens of production and persuasion fall on the plaintiff.  *McNeilly*, 684 F.3d at 615.  "[T]he proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion"; an injunction is an "extraordinary remedy" available only when the circumstances "clearly demand it."  *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000) (internal quotation marks omitted).

A.  Likelihood of Success on the Merits

1.  Contracts Clause

The district court determined that the Retired Employees failed to show a likelihood of success on the merits of their Contracts Clause claim.  It reached this conclusion because they challenged the EM's actions, which it determined did not constitute an exercise of a legislative power, making the Contracts Clause inapplicable. *See New Orleans Waterworks Co. v. La. Sugar Refining Co.*, 125 U.S. 18, 30 (1888) ("The prohibition [against the impairment of contracts] is aimed at the legislative power of the State, and not at the decisions of its courts, or the acts of administrative or executive boards or officers, or the doings of corporations or individuals."); *Ross v. Oregon*, 227 U.S. 150, 162 (1913).  Second, the district court stated that the Retired Employees failed to allege that the state denied them an opportunity to seek recourse through the courts or that the state foreclosed the imposition of an adequate state remedy for an established impairment.  *See Crosby v. City of Gastonia*, 635 F.3d 634, 640 (4th Cir. 2011) ("[R]ecourse to § 1983 for the deprivation of rights secured by the Contracts Clause is limited to the discrete instances where a state has denied a citizen the opportunity to seek adjudication through the courts . . . or has foreclosed the imposition of an adequate remedy for an established impairment.  Section 1983 provides no basis to complain of an alleged impairment in the first instance.").

The court also indicated that some impairments of contract are constitutional, but this does not appear to be a basis for its conclusion that the Retired Employees' claim was unlikely to succeed.  Nonetheless, this court may affirm based on any reason advanced by the City of Pontiac against the issuance of a preliminary injunction that was presented before the district court.  *United Food & Commercial Workers Union, Local 1099 v. Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 349 (6th Cir. 1998).  Therefore, it is appropriate to consider the City of Pontiac's claim that the alleged impairment survives constitutional scrutiny.

The Contracts Clause provides that "No state shall . . . pass any . . . Law impairing the Obligation of Contracts." U.S. Const. art. I § 10, cl. 1. The prohibition against impairments of contracts, however, is not absolute. *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 428 (1934). A claim under the Contracts Clause requires a showing that: "(1) a contract exists, (2) a change in law impairs that contract, and (3) the impairment is substantial." *Mascio v. Pub. Emps. Ret. Sys. of Ohio*, 160 F.3d 310, 313 (6th Cir. 1998) (internal quotation marks omitted). Absent such a showing, there is no constitutional violation.

In this case, it is apparent that the EM impaired the contractual rights of at least some retirees who had been guaranteed various healthcare benefits in CBAs. Indeed, if such contractual rights did not exist or had expired, then seemingly, it would have been unnecessary for the EM to utilize his power under PA 4 to modify the CBAs.

Assuming a contractual impairment, the question becomes whether the impairment is substantial. A court assessing whether an impairment is substantial considers "the extent to which reasonable expectations under the contract have been disrupted." *Buffalo Teachers Fed'n v. Tobe*, 464 F.3d 362, 368 (2d Cir. 2006) (internal quotation marks omitted). In *Buffalo Teachers Fed'n*, the Second Circuit determined that a wage freeze worked such a disruption to employees' reasonable expectations to contractually negotiated wage increases that the impairment was substantial. *Id*. Because this case involves a reduction of benefits, as opposed to a freeze of benefits, the impairment here very well may be more substantial than in *Buffalo Teachers Fed'n*. For this reason, and because defendants do not argue otherwise, a substantial impairment can be presumed.

If the impairment is substantial, to survive constitutional scrutiny, the government must have a legitimate public purpose behind the impairment, and the impairment must be reasonable and necessary to serve that purpose. *Energy Reserves Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 411–12 (1983); *U.S. Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 25 (1977). "A legitimate public purpose is one aimed

at remedying an important general social or economic problem rather than providing a benefit to special interests." *Buffalo Teachers Fed'n*, 464 F.3d at 368 (internal quotation marks omitted). An impairment may be considered reasonable and necessary if: (1) impairing the contract was considered on par with other policy alternatives; (2) a more moderate course would not have served the legitimate public purpose equally well; and (3) the impairment was reasonable in light of the surrounding circumstances. *Id*. at 371.

The City of Pontiac argues that impairing the Retired Employees' contractual rights was reasonable and necessary to serve a legitimate public purpose. The City of Pontiac relies on *Buffalo Teachers Fed'n*, where several teachers unions sought to enjoin a wage freeze implemented by the city board pursuant to the Buffalo Fiscal Responsibility Authority Act. *Id*. at 365–66. Pursuant to the Act, the city board froze the wages of union members, despite contractually negotiated wage increases that had been memorialized in CBAs. *Id*. at 366. The district court granted the defendants' motion for summary judgment, concluding as a matter of law that the wage freeze did not violate the Contracts Clause, and the Second Circuit affirmed. *Id*. at 367, 376.

The Second Circuit determined that the wage freeze was a reasonable and necessary means of addressing the city's fiscal crisis. *Id*. at 368–71. First, the wage freeze was implemented "only after other alternatives had been considered and tried," including a hiring freeze and school closings and layoffs. *Id*. at 371. Second, a temporary wage freeze was moderate relative to the more drastic measure of eliminating more municipal jobs and closing more schools. *Id*. As a further indication of reasonableness, the court considered the temporary and prospective nature of the wage freeze. *Id*. at 372. Finally, although the unions argued that the existence of alternatives made the wage freeze unnecessary, the court declined "to second-guess the wisdom of picking the wage freeze over other policy alternatives, especially those that appear more Draconian, such as further layoffs or elimination of essential services." *Id*. Accordingly, the impairment survived constitutional scrutiny. *Id*.

Likewise, the EM's efforts to address the City of Pontiac's impending insolvency serve a legitimate public purpose. *See Buffalo Teachers Fed'n*, 464 F.3d at 368 (stating that addressing a city's financial problems is a legitimate public purpose); *see also Sanitation & Recycling Indus., Inc. v. City of New York*, 107 F.3d 985, 993 (2d Cir. 1997) (explaining that a legitimate public purpose is one aimed at remedying an important and general social or economic problem). Further, the modifications to the CBAs were implemented only after the City of Pontiac took other drastic steps to reduce its budgetary problems, including elimination of the police department, emergency dispatch services, animal control services, the vital records department, the fire department, and the near elimination of the department of public works. Because retiree healthcare is the City of Pontiac's largest expense, reducing (but not eliminating) healthcare benefits for retirees appears to be the most effective means to improve its financial troubles. It is improper to second-guess the wisdom of the EM's choice to modify retirees' healthcare benefits over other alternatives such as the elimination of further public services. The modifications thus appear reasonable and necessary. Most significantly, the Retired Employees, who have the burden of showing entitlement to injunctive relief, have made absolutely no argument to the contrary.

The Retired Employees filed two letters and notices of supplemental authority, but they still fail to explain how the EM's orders were either unreasonable or unnecessary. In *Yurk v. City of Flint*, No. 01-71149-NZ (Genesee Cnty. Cir. Ct. Dec. 11, 2012), the plaintiffs sought to enjoin the implementation of Order No. 13, which modified the terms of a settlement agreement issued by Flint's emergency manager pursuant to PA 4.[3] Critically, the court reasoned that Order No. 13 was not "necessary" to save the local government from bankruptcy because a more moderate course would have served its public purpose just as well—rather than require the plaintiffs to advance a $100 co-payment for name-brand drugs and seek a refund after the fact by jumping through certain hoops, a more moderate course would have been to require the plaintiffs

---

[3]Incidentally, Flint's emergency manager issued Order No. 13 during PA 4's operative life. Therefore, the court reasoned, "the referendum defeat of 2011 PA 4 has not rendered Order No. 13 invalid or moot." *Id*. at 3.

to pay the $100 co-payment only after they failed to jump through those same hoops. *Id*. at 8. Unlike the plaintiffs in *Yurk*, the Retired Employees have not advanced a more moderate course.

The Retired Employees also point to *Providence Retired Police & Firefighter's Ass'n v. City of Providence*, 2012 R.I. Super. LEXIS 23 (R.I. Super. Ct. Jan. 30, 2012), a case involving the constitutionality of an ordinance requiring retirees to enroll in Medicare as a condition of receiving healthcare benefits, contrary to the terms of their CBAs. Granting the retirees' motion for a preliminary injunction, the court found two indications that the ordinance was unreasonable: (1) Providence was aware of its chronic financial problems when it continuously entered into CBAs guaranteeing healthcare benefits; and (2) the transfer to Medicare was intended to be permanent. *Id*. at *52, 56. Many of the CBAs at issue here, however, were entered into long before the City of Pontiac could have anticipated the economic crisis that has set in over the last several years, and it is unclear whether shifting healthcare costs onto retirees is intended to be permanent.

Lastly, the Retired Employees call our attention to *Welch v. Brown*, No. 12-13808, 2013 WL 1292373 (E.D. Mich. Mar. 29, 2013), where the plaintiffs argued that the reduction of their healthcare benefits was unreasonable and unnecessary, and they suggested more moderate alternatives that would achieve the defendants' stated legitimate public purpose. In this case, however, the Retired Employees have not argued that the reduction of their benefits was unreasonable and unnecessary, and they have not suggested a more moderate course that would address the City of Pontiac's fiscal crisis.

Moreover, in all of the above cases (*Yurk*, *Providence Retired Police & Firefighter's Ass'n*, and *Welch*), the court ruled on a request for injunctive relief in the first instance. Our judgment as an appellate court is confined by the standard of review. We can reverse only when we are convinced that the district court abused its discretion. That a court *could* reasonably grant a preliminary injunction in the first instance does not make the district court's decision in this case an abuse of discretion. Albeit for different

reasons than relied on below, I would conclude that the district court acted within its discretion when it concluded that the Retired Employees failed to show a likelihood of success on the merits of their Contracts Clause claim.  This factor weighs in favor of the City of Pontiac.

## 2.  Federal Preemption

The Retired Employees next allege that the EM's orders are preempted by the Bankruptcy Code, 11 U.S.C. § 903(1), which provides that "a State law prescribing a method of composition [i.e., reduction] of indebtedness of [a] municipality may not bind any creditor that does not consent to such composition."   Although the Retired Employees certainly did not consent to the reduction of their healthcare benefits, they fail to offer authority supporting their contention that PA 4 prescribes a "method of composition," and the only authority on point that has been brought to this court's attention suggests the contrary.  *See Subway-Surface Supervisors Ass'n v. New York City Transit Auth.*, 375 N.E.2d 384, 391 (N.Y. 1978) (holding that a wage freeze in violation of a CBA made pursuant to the Financial Emergency Act for the City of New York did not constitute "composition" and, thus, was not preempted by federal bankruptcy law).

This is not a bankruptcy proceeding, and the EM's orders do not purport to discharge any incurred debt.  Rather, the EM's orders modify the terms of CBAs, a measure that appears to be an effort to eliminate the incurrence of additional debt.  Further, the Supreme Court "has sustained provisions arguably affecting the bankruptcy power where the state laws were not directly in conflict with the Bankruptcy Act" and has "stress[ed] that the federal municipal Bankruptcy Act is not in any way intended to infringe on the sovereign power of a state to control its political subdivisions." *Ropico, Inc. v. City of New York*, 425 F. Supp. 970, 983 (S.D. N.Y. 1976).  Because the Retired Employees' preemption arguments are not well supported, a likelihood of success on the merits at this stage has not been established, and this factor weighs in favor of the City of Pontiac.

### 3.  Due Process

Third, the district court determined that the Retired Employees were unlikely to succeed on the merits of their due process claims.  To establish a procedural due process claim, a plaintiff must demonstrate that he or she has been deprived of a protected property interest without adequate process.  *Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 611 (6th Cir. 2006).  "A contract, such as a collective bargaining agreement, may create a property interest."  *Leary*, 228 F.3d at 741.  Yet it is unclear whether there can be a property interest in lifetime, unchanging healthcare benefits.  *See Bell v. Westmoreland Cent. Sch. Dist.*, No. 87-CV-1592, 1991 WL 33161, \*3 (N.D. N.Y. Mar. 11, 1991) (stating that "a constitutionally protected property interest in the continuation of post-retirement health insurance benefits does not exist"); *cf. Lawrence v. Town of Irondequoit*, 246 F. Supp. 2d 150, 158 (W.D. N.Y. 2002) (finding no constitutionally protected property interest where the plaintiffs continued to receive retirement benefits but at a different level).

Further, having reviewed the excerpts of CBAs provided by the Retired Employees, as the district court observed, there is no provision forever entitling retirees to the exact same healthcare benefits.  Indeed, such a guarantee would be impractical; as the City of Pontiac asserts, "the insurance provided ten years ago is not even commercially available."  Additionally, in the context of an ERISA claim, this court has stated that "[i]f a welfare benefit has not vested, after a CBA expires, an employer generally is free to modify or terminate any retiree medical benefits that the employer provided pursuant to that CBA."  *Yolton v. El Paso Tenn. Pipeline Co.*, 435 F.3d 571, 578 (6th Cir. 2006) (internal quotation marks omitted).  Because we have not been provided with the CBAs in their entirety, it is difficult to discern the intent of the contracting parties and whether healthcare benefits were guaranteed indefinitely or were instead subject to change.  Accordingly, the Retired Employees have failed to carry their burden to demonstrate a likelihood of success on the merits of their due process claim, which tends to weigh in favor of the City of Pontiac.

## B.  Irreparable Harm

Turning to the next factor in the preliminary injunction analysis, the district court determined that the Retired Employees failed to show that they would suffer irreparable harm if an injunction were not granted.  One way to show irreparable harm is by demonstrating a constitutional violation.  *See Overstreet*, 305 F.3d at 578.  As explained in detail above, however, the Retired Employees have not shown a reasonable likelihood that their constitutional rights have been violated, a conclusion which tends to weigh against a finding of irreparable harm.

The other source of irreparable harm asserted in this case is the reduction of retiree healthcare benefits.  The district court's analysis of this argument is very limited.  Although acknowledging that the EM's orders reduce the Retired Employees' healthcare benefits and force them to pay more out-of-pocket expenses (or forego medical treatment), the court did not consider the harm to be irreparable given that their benefits were not being eliminated entirely.  The district court's reasoning is not compelling and overlooks the threat to the Retired Employees' health and safety caused by even a reduction in coverage.  A reduction in healthcare benefits is a recognized source of irreparable harm for purposes of a preliminary injunction.  *See Golden v. Kelsey-Hayes Co.*, 845 F. Supp. 410, 415 (E.D. Mich. 1994) (stating that "reductions in retiree insurance coverage constitute irreparable harm"); *Hinckley v. Kelsey-Hayes Co.*, 866 F. Supp. 1034, 1044 (E.D. Mich. 1994) (same).  With this in mind, but taking into account that a constitutional violation is unlikely, this factor weighs slightly in favor of the Retired Employees.

## C.  Balance of Equities and Public Interest

Nonetheless, the harm to the Retired Employees must be balanced against the threatened harm to others, and consideration must also be given to the public interest. The district court concluded that issuing an injunction would likely cause the City of Pontiac's financial troubles to continue, which would likely result in a complete elimination of healthcare benefits for the Retired Employees, further layoffs, and fewer

public services being provided for the benefit of all residents. Given the drastic measures that the City of Pontiac has already taken to address its fiscal crisis, I cannot disagree with the district court's forecast. These factors thus weigh against the Retired Employees. Balancing the four factors together, and given the highly deferential standard of review, I would hold that the district court did not abuse its discretion when it denied the extraordinary remedy of injunctive relief.

IV.

In my view, the majority improperly remands the case to the district court to address uncontested issues of state law. Instead, I would address the federal constitutional issues raised on appeal and affirm the district court's judgment denying the Retired Employees' request for injunctive relief. In addition, I would grant the Attorney General's motion to intervene. For these reasons, I respectfully dissent.